834 F.2d 725
 Vicky WHITE; Lori Farnes; Vicki Buffat; Louanna Clark;
Sandra Schongalla; Christina Logan; Diana
Foreman, Plaintiffs-Appellants,
v.
Samuel PIERCE, in his official capacity as Secretary,
Department of Housing and Urban Development; Rose Bowman,
Director, Department of Health and Welfare, State of Idaho;
Idaho Housing Agency, a nonprofit corporation organized
under the laws of the State of Idaho, Defendants-Appellees,
and
Otis Bowen*, Secretary of the Department of
Health and Human Resources, Third-Party
Defendant-Appellee.
 No. 86-3721.
 United States Court of Appeals,
Ninth Circuit.
 March 6, 1987.
Decided Dec. 18, 1987.
 
 Randall W. Robinson, Lewiston, Idaho, and Andrew C. Thomas, Caldwell, Idaho, for plaintiffs-appellants.
 Mack A. Player, Dept. of Justice, Washington, D.C., for federal defendants-appellees.
 Elaine Eberharter, Asst. Atty. Gen., Boise, Idaho, for state defendant-appellee.
 Appeal from the United States District Court for the District of Idaho.
 Before GOODWIN, SCHROEDER and FARRIS, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Vicky White and the class[1] of individuals she hopes to represent (hereinafter White) brought this action against the Secretary of the federal Department of Housing and Urban Development (HUD) and the Director of the Idaho Department of Health and Welfare (IDHW), seeking to enjoin an alleged violation of Section 3 of the United States Housing Act of 1937, 42 U.S.C. Sec. 1437a (1982). White appeals a judgment in favor of HUD and IDHW on the pleadings. The issue is whether the challenged HUD regulation--24 C.F.R. Sec. 813.107(a)(3)--violates the statute.
 
 
 2
 The facts are not in dispute. White receives welfare benefits from the State of Idaho and participates in the federal housing program established by Section 8 of the Housing Act. 42 U.S.C. Sec. 1437f. Under this program, the federal government subsidizes private housing for low-income families. Each Section 8 family must contribute toward its rent according to a statutorily-prescribed formula based on the family's income, and HUD pays the difference between that number and the actual rent. For many Section 8 families nationwide, the formula is straightforward: families pay either ten percent of monthly income or thirty percent of adjusted monthly income, whichever is higher. 42 U.S.C. Sec. 1437a(a)(1)-(2). The federal government pays the balance. 42 U.S.C. Sec. 1437f(c)(3). However, the statute creates an exception in states such as Idaho, which calculates benefits according to a portion of actual rental costs. HUD determines how much those families must contribute towards their rent according to the amount of the housing grant the family receives from the state welfare agency. 42 U.S.C. Sec. 1437f(c)(3), incorporating by reference 42 U.S.C. Sec. 1437a(a)(3).
 
 
 3
 White argues that the HUD regulation causes her to pay more than the statutory limit set forth in Sec. 1437a(a)(3):
 
 
 4
 A family shall pay as rent ... the highest of the following amounts, rounded to the nearest dollar:
 
 
 5
 (1) 30 per centum of the family's monthly adjusted income;
 
 
 6
 (2) 10 per centum of the family's monthly income; or
 
 
 7
 (3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.
 
 
 8
 HUD and IDHW concede that White's rent exceeds 30 per cent of her monthly adjusted income and 10 per cent of her gross income. White argues that her rent, as computed according to the challenged regulation, also exceeds the amount specified in subsection (a)(3), and therefore violates the statute.
 
 
 9
 Idaho's welfare agency usually computes its grant in two steps. First, IDHW determines the recipient's "standard of need" by adding to a predetermined cost of basic needs (food, clothing, etc.) actual shelter costs. Next, IDHW ratably reduces the standard of need to arrive at the amount it will actually disburse to the recipient. Cf. Rosado v. Wyman, 397 U.S. 397, 413, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970) (state need not provide 100% of standard of need). At present, IDHW beneficiaries receive 55% of their standard of need.
 
 
 10
 For welfare families such as White's, which also receive federal housing benefits, IDHW adds an extra step. Federal law allows a state to deduct from its calculations of a family's standard of need, the amount of any federal housing subsidy. See 42 U.S.C. Sec. 602(a)(7)(C)(ii) (1982) (discussed infra ). Thus, after making a tentative allotment through the usual procedure, IDHW waits for HUD to announce the amount of its rent subsidy. Then IDHW recalculates the family's shelter costs and fixes those costs at actual rent, minus the federal subsidy. The adjusted shelter cost is added to the old basic needs figure to arrive at a new standard of need. The new standard of need is then ratably reduced to arrive at the state welfare award.
 
 
 11
 The following hypothetical shows that IDHW's method of calculating benefits sharply increases the percentage of their own funds Section 8 tenants must spend on rent. Assume a family receives welfare from IDHW and pays $200 per month for rent and $200 per month on other basic needs. IDHW determines that family's standard of need to be $400 ($200 for shelter plus $200 for basic needs). IDHW then ratably reduces the "basic need" figure to 55% and allots the family $220 per month. Idaho thus calculates the housing portion of the welfare grant to be $110.
 
 
 12
 Assume next that the family also participates in the Section 8 housing program. According to 42 U.S.C. Sec. 1437a(a)(3), HUD subsidizes by $90 the difference between $110, the housing portion of the welfare grant, and the actual rent of $200. At this point the family appears to be spending 50% of its state welfare income on rent, as the Section 8 subsidy means the family will spend $110 for rent out of a total check of $220.
 
 
 13
 Now, however, Idaho recalculates its own grant, because the federal subsidy reduces the hypothetical shelter costs to $110 (actual rent minus HUD subsidy). Adding $110 to $200 (basic needs), the standard of need becomes $310 instead of $400, and the total IDHW grant after ratable reduction becomes $170.50 instead of $220. The family must then pay $310 for rent and basic needs ($200 rent plus $200 basic needs minus $90 housing subsidy) but receives a total welfare grant of $170.50. Of that amount, 69%, or $110, goes to rent.
 
 
 14
 Once IDHW reduces its housing grant, the family returns to HUD for an increase in the Section 8 subsidy. After all, HUD had based the subsidy on the housing grant it assumed the family would receive from IDHW. Now that IDHW has reduced its grant, the number upon which HUD based its calculations no longer represents the family's income. However, a regulation codified at 24 C.F.R. Sec. 813.107(a)(3) if read literally forecloses an increase in the HUD subsidy by providing that the family's contribution will be determined according to its standard of need ratably reduced once.[2] HUD ignores later reductions in state welfare benefits resulting from HUD's own subsidy. The family must pay the difference between its actual rent and the total package of federal and IDHW housing benefits. As the family's income consists wholly of welfare benefits, the additional rent money must come from grant money allocated for basic needs such as food and clothing.
 
 
 15
 The district court held that 24 C.F.R. Sec. 813.107(a)(3) was a reasonable application of subsection Sec. 1437a(a)(3), the so-called "welfare rent" provision. We review the court's interpretation of the statute de novo. See Grunfeder v. Heckler, 748 F.2d 503, 505 (9th Cir.1984) (en banc). We give weight, however, to HUD's construction of the statute, which the agency is entrusted to administer. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694, reh'g denied, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); Monet v. INS, 791 F.2d 752, 753 (9th Cir.1986).
 
 
 16
 In construing a statute, the court attempts to discern and effectuate legislative intent. Adams v. Morton, 581 F.2d 1314, 1320 (9th Cir.), cert. denied sub nom. Gros Ventre Tribe v. United States, 440 U.S. 958, 99 S.Ct. 1498, 59 L.Ed.2d 771 (1979). We begin with the language of the statute itself. Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The plain meaning will prevail unless a clearly expressed legislative intent is to the contrary, id., or unless the plain meaning leads to absurd results. Bechtel Constr. Inc. v. United Bhd. of Carpenters, 812 F.2d 1220, 1225 (9th Cir.1987); City of Los Angeles v. Adams, 556 F.2d 40, 47 (D.C.Cir.1977).
 
 
 17
 White argues convincingly that the plain meaning of 42 U.S.C. Sec. 1437a(a)(3) requires a Section 8 family receiving public assistance to contribute toward its rent the exact amount of its welfare housing allowance. (In our hypothetical case, $110.) Despite its complicated syntax, subsection (a)(3) plainly requires the family to pay as rent that part of its welfare grant specifically designated for housing. Accord Howard v. Pierce, 738 F.2d 722, 727 (6th Cir.1984) (dicta). In other words, the statute directs that welfare families receive a complete rent subsidy from a combination of state and Section 8 benefits.
 
 
 18
 However, while it may have been practicable to enforce the statute's plain meaning in 1974, HUD argues that type of enforcement is no longer available. In the budget-cutting drive of the Omnibus Budget Reconciliation Act of 1981 (OBRA),[3] Congress added a provision to the Social Security Act with significant consequences for the welfare rent provision of the Housing Act. This provision, part of the AFDC program (subchapter 4 of the Social Security Act), states that
 
 
 19
 A State plan for aid and services to needy families with children must [provide that the State agency]
 
 
 20
 * * *
 
 
 21
 (C) may, in the case of a family claiming or receiving aid under this part for any month, take into consideration as income (to the extent the State determines appropriate, as specified in such plan, and notwithstanding any other provision of law)
 
 
 22
 * * *
 
 
 23
 (ii) an amount not to exceed the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income....
 
 
 24
 Pub.L.No. 97-35, Sec. 2302(b), 95 Stat. 845, codified at 42 U.S.C. Sec. 602(a)(7)(C)(ii)(1982).
 
 
 25
 This statute expressly permits states to subtract from their housing grants the amount of any housing subsidy the family receives from another source, notwithstanding any other provision of law.[4] The plain meaning of this statute would allow a state to reduce its welfare benefits every time HUD increases a housing subsidy.
 
 
 26
 As noted earlier, Sec. 1437a(a)(3) in plain terms requires HUD to calculate its subsidy according to the actual housing grant received by the tenant. However, the advent of 42 U.S.C. Sec. 602(a)(7)(C)(ii) makes such a calculation virtually impossible, because the actual housing grant changes constantly; every time HUD raises its subsidy to compensate the family for IDHW's reduction in benefits, IDHW reduces its own benefits again. Were we rigidly to enforce the plain meaning, the agencies would be forced to recalculate benefits over and over again indefinitely like a snake swallowing itself tail first. As the state contribution disappears, HUD effectively would subsidize almost the entire rent of the welfare family. Congress clearly did not intend this result; a basic premise of the "welfare rent" provision is that the state welfare agency will contribute toward rent. Further, as HUD points out, the multiple recalculations would create an administrative nightmare.[5] Therefore, we must conclude that the plain meaning of each statute cannot be enforced without absurd results.
 
 
 27
 White argues that requiring the family to fill the gap between housing cost and subsidy also leads to absurd results. She points out that under HUD's regulation an Idaho welfare family could have to pay 69 percent of its income in rent, although a Section 8 family living on private income or on welfare in a flat-grant state pays at most 10 percent of gross or 30 percent of net income. HUD's interpretation requires a family to spend on rent, money presumed by the state in the "basic needs" calculation to be money for food and clothing. Because the "basic needs" have already been reduced to 55% of actual basic needs, she contends that this result directly contradicts Congress' long-standing goal of providing affordable housing to the most needy, as well as violating the plain meaning of Sec. 1437a(a)(3).
 
 
 28
 By enacting 42 U.S.C. Sec. 602(a)(7)(C)(ii) without adjusting the welfare rent provision, the 1981 Congress left the two policies--a desire to cut federal government spending[6] and the earlier policies of the Housing Act--on a seeming collision course.
 
 
 29
 White argues that HUD and IDHW could resolve the dilemma by negotiating and apportioning between themselves each welfare family's housing cost. However, although the legislative history of Sec. 1437a(a)(3) contains a passing reference to negotiated rents,[7] nothing in the statute's language requires it. HUD's decision to base its subsidies on the originally determined housing allotment, rather than on the actual housing grant, represents a reasonable accommodation of the conflicting statutory policies. Despite the regulation's consequences for families in White's position, we cannot say that Congress would have refused to sanction it. We therefore have no choice but to try to make it work, if we can. See Chevron, 467 U.S. at 845, 104 S.Ct. at 2783.
 
 
 30
 We doubt that Congress intended a welfare recipient to pay 69% of her check for rent or that welfare recipients be forced to pay rent with money specifically designated for food and clothing. Rather, it appears more likely that Congress envisioned that states like Idaho would be allowed to deduct only the initial federal subsidy from the state's calculation of a welfare family's housing cost, and reduce its grant only once. When the federal government then increased its grant to cover the increased costs of housing to the family due to the initial reduction by the state agency, the state would not be allowed a second reduction. This solution places the state in no worse position than it is in under HUD's current interpretation. This interpretation is consonant with Congress' intent in enacting Sec. 602(a)(7)(C)(ii) to allow states to reduce their grants when part of the costs on which the grant was based is met by federal subsidy and it also allows compliance with Sec. 1437a(a)(3).
 
 
 31
 Thus, in the example above, the total IDHW grant will be $170.50. Of that $170.50, $60.50 is designated for shelter.[8] Thus, HUD must make up the difference between the actual shelter cost of $200 and the portion of the grant designated for shelter, $60.50. HUD must pay $139.50. Under our construction of Sec. 602a(7)(C)(ii), the state cannot then reduce its grant again based on the increased federal subsidy. This result gives effect to both competing statutes and reads the regulation as allowing "one application of the percentage" and one compensating recalculation by HUD. It gives maximum effect to legislative intent and minimizes the absurdity of the result. When so interpreted, the regulation does not violate the statute and the disappearing subsidy problem is avoided.
 
 
 32
 White also asserts the claims of certain "grandfathered" families, who resided in Section 8 housing before August 1982, the month when OBRA took effect. In substance, these claims involve the same issues that we have considered with respect to 24 C.F.R. Sec. 813.107(a)(3), and we deny them for the same reasons. We also deny White's request for class certification. Given our holdings on her substantive claims, class certification would serve no purpose.
 
 
 33
 The judgment of the district court is modified to conform to the views expressed above and affirmed as modified. Costs to the plaintiffs.
 
 
 
 *
 Otis Bowen is substituted for his predecessor, Margaret M. Heckler, Secretary of Health and Human Services, pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 The district court granted a Rule 12(c) judgment to defendants without ruling on plaintiffs' motion for class certification
 
 
 [2]
 24 C.F.R. Sec. 813.107(a)(3) provides:
 If the Family receives Welfare Assistance from a public agency and a part of such payments, adjusted in accordance with the Family's actual housing costs, is specifically designated by such agency to meet the Family's housing costs, [the family shall contribute] the monthly portion of such payments which is so designated. If the Family's Welfare Assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph (a)(3) shall be the amount resulting from one application of the percentage.
 
 
 [3]
 Pub.L.No. 97-35, 95 Stat. 357, codified in scattered sections of the United States Code
 
 
 [4]
 This statute contrasts with earlier congressional enactments affecting welfare tenants in public housing. In 1971, concerned that the federal attempts to limit rent in public housing were prompting states to reduce their welfare awards, Congress enacted the so-called Second Brooke Amendment to the Housing Act, Pub.L. 92-213, Sec. 9, 85 Stat. 776 (1971), which prohibited public welfare agencies from reducing benefits to any tenant as a result of statutorily-prescribed rent reductions in federal housing programs. The amendment expressed Congress' concern that the states were nullifying the effect of federal limits on public housing rent, a concern no longer present because Congress repealed the Second Brooke Amendment in 1974 when it enacted the "welfare rent" provision now codified at 42 U.S.C. Sec. 1437a(a)(3)
 
 
 [5]
 White argues that the downward spiral and recalculations eventually stop because the utility allowances are ratably reduced only once. In White's appendix she demonstrates that after eight calculations the figures remain constant. White suggests that tables could be prepared based on housing costs and utility allowances which would allow laypersons to administer the system easily. However, counsel for HUD pointed out at oral argument, that another variable--outside income--may also come into play. At this point, tables are impossible; and numerous recalculations for individuals would produce an administrative nightmare
 
 
 [6]
 See S. Rep. No. 97-139, reprinted in 1981 U.S. Code Cong. & Admin. News 396, 397-98
 
 
 [7]
 See H.R. Rep. 1114, 93rd Cong. 2d Sess. 190 (June 17, 1974) (Supplemental view of Representative Koch on H.R. 1536)
 
 
 [8]
 The amount $60.50 represents fifty-five percent of $110, the family's shelter costs after HUD subsidizes $90 of the original rent figure