Sheila TELLO and Albert
Merrill, Plaintiffs,

v.

Linda McMAHON, in her capacity as Director of the California Department of
Social Services; and Jessie R. Huff, in
his capacity as Director of the Department of Finance, Defendants.

No. CIV. S–86–0532 LKK.

United States District Court,
E.D. California.

Jan. 29, 1988.

John K. Van de Kamp, Atty. Gen., Dennis Eckhart, Deputy Atty. Gen., Sacramento, Cal., for defendants.

Edward Barnes, Legal Aid Society of Alameda County, Oakland, Cal., James Stoepler, Napa County Legal Assistance Agency, Napa, Cal., Mark Greenberg, Western Center on Law and Poverty, Los Angeles, Cal., Timothy J. Casey, Mary R. Mannix, Center on Social Welfare Policy and Law, New York City, Charles Greenfield, Legal Aid Society of Santa Clara County, San Jose, Cal., for plaintiffs.

### ORDER

KARLTON, Chief Justice.

Plaintiffs in this class action challenge California's policy of reducing assistance to working recipients of Aid to Families With Dependent Children ("AFDC") as a penalty for filing an "untimely" report of earnings. Plaintiffs assert that the State's policy is based on an erroneous interpretation of a federal statute. The parties stipulated to undisputed facts and filed cross-motions for summary judgment, whereupon the court took the matter under submission. The motions are disposed of herein.

### I

### STANDARDS FOR SUMMARY JUDGMENT UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 468, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir.1987); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.1984).

The parties' Stipulation to Undisputed Facts demonstrates that there are no genuine issues as to any material fact. Each party argues that it is entitled to judgment as a matter of law. Accordingly, the court turns to an examination of the statutes to be construed.

### II

### THE STATUTORY AND REGULATORY SCHEME

#### A. *The Statutes*

The AFDC program was established by Title IV of the Social Security Act of 1935 "to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them." *Shea v. Vialpando*, 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974). The Supreme Court has described the program as one " 'based on a scheme of cooperative federalism.' " *Heckler v. Turner*, 470 U.S. 184, 189, 105 S.Ct. 1138, 1141, 84 L.Ed.2d 138 (1985) (quoting *King v. Smith*, 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968)). The federal government reimburses each State that chooses to participate, on a percentage basis, and in return the State must administer its assistance program pursuant to a State plan that conforms to federal statutes and regulations. 42 U.S.C. §§ 602, 603; *Turner*, 470 U.S. at 189, 105 S.Ct. at 1141. States are largely free to determine standards of need and level of benefits, *Rosado v. Wyman*, 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970); *King*, 392 U.S. at 318–19, 88 S.Ct. at 2134; *LaMadrid v. Hegstrom*, 830 F.2d 1524, 1526 (9th Cir.1987), as well as specific procedures to be employed, *Kitchens v. Bowen*, 825 F.2d 1337, 1340 (9th Cir.1987).

Among the federal provisions that bind participating States, there are several that

are relevant to the present controversy. As an initial matter, the State plan must provide that aid "shall ... be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 602(a)(10)(A). The State "shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid," except as otherwise provided. 42 U.S.C. § 602(a)(7)(A). One of the exceptions is a requirement that States disregard from earned income a flat amount of $75 per month to offset work expenses. 42 U.S.C. § 602(a)(8)(A)(ii). States must also disregard an amount equal to actual expenditures for child care, up to $160 per month per child. 42 U.S.C. § 602(a)(8)(A)(iii). As a special "work incentive," additional amounts of income are disregarded during the first year of a working parent's employment, although the amount decreases after the first four months. 42 U.S.C. §§ 602(a)(8)(A)(iv) and 602(a)(8)(B)(ii). The parties refer to these provisions [1] in the vernacular as "income disregards," and the court adopts that term as a matter of convenience.

At the heart of the present controversy is the provision that States shall *not* apply the income disregards created by section 602(a)(8)(A)(ii) (the flat $75 for work expenses), (iii) (actual child care expenses up to the maximum), and (iv) (the special first-year work incentive) if the person who earned the income "failed without good cause to make a timely report (as prescribed by the State plan pursuant to paragraph (14)) to the State agency of earned income received in such month." 42 U.S.C. § 602(a)(8)(B)(i)(III).

Section 602(a)(14) requires that a State plan must

with respect to families in the category of recent work history or earned income cases (and at the option of the State with respect to families in other categories), provide (A) that the State agency will require each family to which it furnishes aid ... to report, as a condition to the continued receipt of such aid ..., each month to the State agency on—

(i) the income received, family composition, and other relevant circumstances during the prior month; and

(ii) the income and resources it expects to receive, or any changes in circumstances affecting continued eligibility or benefit amount, that it expects to occur, in that month (or in future months).... 

42 U.S.C. § 602(a)(14).

### B. *The Regulations*

The federal agency responsible for administering the AFDC program is the Department of Health and Human Services ("HHS"). The HHS has promulgated regulations that delineate how monthly reports are to be treated by State agencies and specify what notices are required. 45 C.F.R. § 233.37. If a recipient files a "timely" and complete report, the income disregards are applied. 45 C.F.R. § 233.37(a). If an incomplete report is filed, or no report is filed at all, or a complete report is filed late, the State must send a written notice of discontinuance of benefits, giving the recipient 10 days to file a report and request reinstatement, although the income disregards will not be applied even if reinstatement is granted, unless good cause is found. 45 C.F.R. § 233.37(b) and (c).

The federal regulations do not define "timely," nor do they provide any guidelines as to what constitutes a "timely" report. Rather, HHS leaves the determination of what constitutes timeliness to each State. 45 C.F.R. § 233.7(b). The HHS model plan form includes this sentence: "The monthly report of earned income is not timely if it is received later than —— days from the end of the budget month." The State enters the number of its choice, subject to HHS approval.

### C. *The California System*

In California, overall responsibility for the AFDC program is vested in the Department of Social Services ("Department"), although the program is actually administered by the county welfare departments.

The Department requires *all* AFDC recipients to file monthly reports, as a State

---

1. The history of 42 U.S.C. §§ 602(a)(7) and (a)(8) is set out in detail in *Turner,* 470 U.S. at 190–92, 105 S.Ct. at 1142–43.

is free to do pursuant to 42 U.S.C. § 602(a)(13) and (14). Each month is thus a "report month" for California AFDC recipients. The Department's monthly reporting form, called a "CA-7," requires information about income earned during the previous month, which is referred to as the "budget month." AFDC grants are issued in the "payment month," which is the month following the report month. This three-month system (budget month, report month, and payment month) complies with federal law. *See* 42 U.S.C. § 602(a)(13) and (14).

In California's plan, which has been approved by the HHS, the 11th day is the deadline for monthly reporting without loss of income disregards in the absence of good cause shown. If an AFDC recipient has not filed a complete CA-7 by the 11th day of the report month, the county agency sends the recipient a notice that benefits will be discontinued for failure to file, unless a complete CA-7 is filed by the first working day of the next month (the payment month). If a completed CA-7 is received by the first working day of the payment month, but after the 11th of the report month, the agency does not discontinue benefits, but it does not apply the income disregards in calculating the recipient's grant entitlement, unless the agency determines that the recipient had good cause for not reporting earlier. The same penalty is imposed if the recipient files a report before the 11th day of the report month, and the report does not fully report and substantiate earned income. Stipulation of Undisputed Facts at 2-5. The California system provides for 10-days advance notice of action.

### III

### PLAINTIFFS' CONTENTIONS AND THE CONSEQUENCES OF UNTIMELY FILING UNDER THE CALIFORNIA SYSTEM

#### A. *Plaintiffs' Contentions*

Plaintiffs assert that the State's policy concerning income disregards is based on an erroneous interpretation of 42 U.S.C. § 602(a)(8)(B)(i)(III). First Amended Complaint at 2. The statute makes AFDC income disregards unavailable when income is not reported "timely." Plaintiffs contend that a report of income is timely if it is submitted in time for the earnings to be considered in the Department's payment computation. Plaintiffs' interpretation of the statute is based on the premise that the penalty provision is intended to affect only recipients who abuse the program by failing to report earnings in time for consideration, thereby causing overpayments and necessitating adjustments in future months. *Id.*

#### B. *The Effect of An Untimely Filing*

As the facts in this case demonstrate, the failure to obtain the benefit of income disregards has major adverse consequences on the economic well-being of AFDC recipients.

##### 1. *Sheila Tello* [2]

At the relevant time, plaintiff Sheila Tello ("Tello") lived in Napa County with her daughter, who is now three years old. Tello was the sole provider for her child. Because of her daughter's age, Tello was exempt from working as an AFDC eligibility requirement. 42 U.S.C. § 602(a)(19)(A)(v). Nevertheless, because she preferred to work, Tello was working in November of 1985 at a Burger King, where she earned $3.45 an hour.

In November 1985, Tello earned $480.42 and took home net pay of $392.45. She paid $100.00 for child care, leaving $292.45 for the family's needs. In December 1985, Tello filed a CA-7 in person. Her recollection is that she filed the report on December 11, 1985, but the agency's records indicate that the report was not filed until December 13, 1985. The CA-7 accurately reported Tello's November gross earnings and was accompanied by substantiation in the form of paystubs. Since the agency determined that the report had not been filed on or before December 11, 1985, Tello

---

**2.** The description of Sheila Tello's case is derived from Plaintiffs' First Amended Complaint; the Declaration of Sheila Tello; Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 11-14; and Plaintiffs' Exhibits 1-5.

was notified that income disregards would be denied as to her November 1985 earnings.

In December 1985, the maximum aid payment available to a family of two under the California State plan was $474.00, an amount that was equal to 35% of the 1986 federal poverty level for two. Since Tello's gross income of $480.42, not reduced by any income disregards, exceeded the maximum aid payment available, Tello was not eligible for any AFDC benefits at all in the payment month of January 1986. If the income disregards had been applied, Tello would have received a benefit payment of $169.00 in January 1986.[3]

The devastating impact of the penalty provision is obvious. If Tello had not worked at all in November 1985, she would have received a benefit payment of $474.00. If income disregards had been applied to her actual earnings, she would have had a total of $461.45 from the combination of her net earnings less child care expenses ($392.45 minus $100.00) and her AFDC benefit payment ($169.00). Without income disregards, she had only her net earnings, less child care expense, of $292.45.

### 2. Albert Merrill[4]

At the relevant time, plaintiff Albert Merrill ("Merrill") lived in Santa Clara County with his wife and three teenage children. Merrill is unable to work for medical reasons relating to spinal injuries. In November 1984, Merrill's wife worked as a nurse's aide. Her gross pay was $620.84, with net pay of about $509.00. In December 1984, Merrill completed a CA-7, reporting accurately his wife's gross earnings for November, but he forgot to include paystubs as verification. The report was received by the county agency on December 3, 1984. On December 10, 1984, the agency sent Merrill a notice that the report was incomplete because of the missing paystubs. Merrill then submitted the paystubs, which were received by the agency on December 14, 1984. On December 18, 1984, the agency notified Merrill that income disregards would be denied as to the November 1984 income because of his failure to file a complete CA-7 on or before December 11, 1984.

In December 1984, the maximum aid payment available to a family of five under the California State plan was $753.00. Since income disregards were not applied, the maximum aid payment was reduced by the full amount of Mrs. Merrill's gross earnings, resulting in a January 1985 benefit payment of $132.00. With the income disregards, the family would have been entitled to a benefit payment of $409.00.[5] The importance of an additional $277.00 is obvious, particularly in light of the fact that the 1985 federal poverty level for a family of five was $1,037.00.

## IV

### STATUTORY CONSTRUCTION

#### A. General Principles

■ While the courts are the final authorities on questions of statutory interpretation, *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *California Energy Resources Conservation & Dev. Comm'n v. Johnson*, 807 F.2d 1456, 1461 (9th Cir.1987), their task when interpreting a federal statute is to ascertain the intent of Congress and to give effect to that intent. *Foxgord v. Hischemoeller*, 820 F.2d 1030, 1032 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987) (citing *United States v. Taylor*, 802 F.2d 1108, 1113 (9th

---

**3.** Application of income disregards would have reduced Tello's $480.42 gross earnings by the $75.00 standard disregard and a $100.00 child care disregard, leaving a net amount of $305.42, rounded off to $305.00. The maximum aid payment available would have been reduced by $305.00: $474.00 less $305.00 equals $169.00.

**4.** The description of Albert Merrill's case is derived from Plaintiffs' First Amended Complaint; the Declaration of Albert Merrill; Plaintiffs'

Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 7–11; and Plaintiffs' Exhibits 6–7.

**5.** Mrs. Merrill's gross earnings of $621.00 would have been reduced by the $75.00 standard disregard and a work incentive disregard of $202.00, leaving a net amount of $344.00 to be deducted from the maximum aid payment available: $753.00 less $344.00 equals $409.00.

Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987)).

■ The first step of any district court in resolving a matter turning on statutory construction is to determine if there is binding authority construing the statute. *Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982); *Brown v. Baden,* 815 F.2d 575, 576 (9th Cir.) (per curiam), *cert. denied,* — U.S. —, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). If not, the court must undertake its own effort to discover the statute's meaning.

■ As this court has recently observed on more than one occasion, the Supreme Court appears to have initiated a process of refining the method for ascertaining congressional intent and in the process has evolved a hierarchy with regard to the canons of statutory construction. *Sacramento Regional County Sanitation Dist. v. Thomas,* 668 F.Supp. 1427, 1431 (E.D.Cal. 1987); *Catholic Social Servs., Inc. v. Meese,* 664 F.Supp. 1378, 1382 (E.D.Cal. 1987). Under this developing doctrine, analysis begins with application of the plain meaning rule and is followed by examination of the legislative history. If any ambiguity remains after application of these two primary means of statutory construction, the court may apply other textual means of construction, turning to extrinsic aids only as a last resort. Canons of construction extrinsic to the text cannot, under any circumstances, be used to create an ambiguity that is not either inherent in the language employed by Congress or derived from the legislative history. *Catholic Social Servs.,* 664 F.Supp. at 1382.

■ In the absence of binding authority, the court must look first to the language of the statute. *Turner,* 470 U.S. at 193, 105 S.Ct. at 1144; *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Brock v. Writers Guild of America, West,* 762 F.2d 1349, 1353 (9th Cir.1985). The purpose of this critical first step of the process is to determine whether the statutory language is clear and unambiguous, for such language must ordinarily be regarded as conclusive. *North Dakota v. United States,* 460 U.S.

300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). *See INS v. Cardoza–Fonseca,* 480 U.S. —, — n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (there is a "strong presumption that Congress expresses its intent through the language it chooses"). If the language is plain, no further construction of the statute is required, for there is nothing to construe. *Cardoza–Fonseca,* 480 U.S. at — n. 29, 107 S.Ct. at 1220–21 n. 29; *Chevron, U.S. A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

■ Nevertheless, the plain meaning rule does not prohibit resort to legislative history. *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Heppner v. Alyeska Pipeline Service Co.,* 665 F.2d 868, 871 (9th Cir.1981). The court may review legislative history in order to determine whether there is "clearly expressed legislative intention" contrary to the plain language of the statute. *Cardoza–Fonseca,* 480 U.S. at — n. 12, 107 S.Ct. at 1213 n. 12; *Heppner,* 665 F.2d at 871. Very strong evidence, if not explicit language, from the legislative history is necessary to overcome the plain meaning naturally to be drawn from the language of a statute. *In re Seidel,* 752 F.2d 1382, 1385 (9th Cir.1985). Under these stringent standards, if legislative history does cast doubt on otherwise plain language, then the statute is ambiguous, and resort must be had to other aids to statutory construction, *Catholic Social Servs.,* 664 F.Supp. at 1382–83, beginning with textual aids.

■ The interpretation of a statute by the agency charged with its administration is one of the traditional tools employed to determine congressional intent, *Brock,* 762 F.2d at 1353, but this canon, as an extrinsic aid to construction, is secondary to application of the plain meaning rule, examination of the legislative history, and other tools of critical textual examination. *Cardoza–Fonseca,* 480 U.S. at —, 107 S.Ct. at 1221; *Catholic Social Servs.,* 664 F.Supp. at 1382–83. If there is an ambiguity, the administrative interpretation becomes relevant, *Deukmejian v. United*

*States Postal Serv.,* 734 F.2d 460, 462 (9th Cir.1984) (per curiam), and, while not conclusive, if consistent with the statutory purpose and linguistically reasonable, is entitled to deference. *Young v. Community Nutrition Inst.,* 476 U.S. 974, 981–982, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986); *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125–26, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985); *Cook Inlet Native Ass'n v. Bowen,* 810 F.2d 1471, 1473 (9th Cir. 1987); *Deukmejian,* 734 F.2d at 462.

### B. *Construction of the Social Security Act*

If construction of the Social Security Act is required, the law has evolved a standard for construction premised upon the statute's purpose. Thus, traditionally the Social Security Act, because of its remedial purpose, has been construed liberally. *Doran v. Schweiker,* 681 F.2d 605, 607 (9th Cir.1982); *see also Benitez v. Califano,* 573 F.2d 653, 655 (9th Cir.1978). The purpose of the statute, as expressed by Congress, is that

> of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection....

42 U.S.C. § 601.

In 1981, Congress adopted various amendments to the Social Security Act through the Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357 (1981). These amendments have injected a cost-cutting focus that appears to compete with the remedial goals of the statute, even though "the OBRA Congress neither changed the language of the AFDC statement of purpose nor abandoned the statutory goals." *Turner,* 470 U.S. at 205,

105 S.Ct. at 1150. *See Edwards v. McMahon,* 834 F.2d 796, 801 (9th Cir.1987) (recognizing that Congress intended OBRA to reduce federal expenditures). The Supreme Court detected in OBRA "a change in strategy on Congress' part—away from financial incentives and toward programs designed to find employment for recipients and oblige them to take it." *Turner,* 470 U.S. at 208, 105 S.Ct. at 1151. On that basis, the Court approved a regulatory scheme that, in pursuit of short-term budgetary objectives, threatened to dissipate indirect financial incentive to employment, thus creating the risk of a long-term increase in expenditures. *Id.* at 205–06, 105 S.Ct. at 1149–50.

This new congressional strategy intensifies the difficulty in determining whether a particular regulation or State plan comports with legislative intent. *See, e.g., White v. Pierce,* 834 F.2d 725, 729 (9th Cir.1987) (OBRA amendment to a provision of the Social Security Act put the long-standing congressional goal of providing affordable housing to the most needy on a seeming collision course with a desire to cut federal government spending).

### V

### RESOLUTION OF THE MOTIONS

### A. *Case Law*

As noted above, it is necessary for this court, as a subordinate court, to first ascertain whether there is a binding construction of the statute in question, by either the Supreme Court or the Ninth Circuit Court of Appeals. In the instant case, no such binding construction exists. Indeed, the only published opinion that has addressed issues relating to the reporting requirements established by the OBRA amendments is *Schroeder v. Hegstrom,* 590 F.Supp. 121 (D.Ore.1984), in which the timeliness of reports was not an issue.

### B. *Application of the Plain Meaning Rule*

The AFDC statute requires that income disregards must not be applied where a recipient fails, without good cause,

"to make a timely report (as prescribed by the State plan pursuant to paragraph (14)) to the State agency of earned income received in such month." 42 U.S.C. § 602(a)(8)(B)(i)(III). Under paragraph (14), a family with a member who works must report each month to the state agency on "(i) the income received ... during the prior month; and (ii) the income and resources it expects to receive ... in that month." 42 U.S.C. § 602(a)(14). Paragraph (8) does not define "timely," nor does anything in the paragraph permit the reader to impose any particular independent parameter. In that sense, it may be fairly said that the boundaries of "timeliness" are not defined by the section itself. Nonetheless, by its terms, the statute refers to and incorporates paragraph 14. In that regard, two canons of textual construction aid in resolution of this case. First, the language of a section or subsection must be read in the context of the statute as a whole. *Stafford v. Briggs,* 444 U.S. 527, 535, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980); *Green v. Commissioner,* 707 F.2d 404, 405 (9th Cir.1983); *Flint v. California,* 594 F.Supp. 443, 447 (E.D.Cal.1984). "The words of a statute should be harmonized internally and with each other to the extent possible." *Cook Inlet Native Ass'n,* 810 F.2d at 1474 (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973). Nevertheless, the court must examine the language in isolation as well as in context and must "give significance to every word, phrase, sentence and part of an act." *In re Borba,* 736 F.2d 1317, 1320 (9th Cir.1984).

The parenthetical clarification following the phrase "timely report" in 42 U.S.C. § 602(a)(8)(B)(i)(III) indicates that one must look to the State plan to determine what constitutes a "timely report," i.e., a timely report is a report prescribed by the State plan pursuant to paragraph (14). While the complexities of paragraph (14) obfuscate rather than clarify, a careful reading leads to the ineluctable conclusion that Congress left the determination of timeliness to the State, with only one federal requirement as to timing. Under the reporting requirements of paragraph (14), the family must

"report ... each month ... on—(i) the income received ... during the prior month." Thus, the single requirement under federal law is that income be reported in the month after it is earned.

While paragraph (14) does not specify a time within the report month by which reports must be filed in order to be timely, the words of the statute demonstrate that Congress did not contemplate the filing of reports at the end of the report month (or, as plaintiffs contend, by the first working day of the payment month). The statute requires the report to include information about "the income and resources [the family] expects to receive, or any changes in circumstances affecting continued eligibility or benefit amount, that it expects to occur, in that month (or in future months)." 42 U.S.C. § 602(a)(14). "That month" refers to the report month. If the report were filed at the end of the report month, there would be no need to project income the family "expects to receive" or changes the family "expects to occur" during the report month. The logical inference is that Congress expected participating States to select a due date early enough in the report month that it would be necessary to project income during the remainder of that month.

There is nothing in the language of this paragraph to support plaintiffs' theory that the state is not free to set a date within the report month by which reports are due, and to set a different deadline for a determination of continued eligibility.

## C. *Examination of the Legislative History*

Although the legislative history of the Social Security Act is quite full, there is little legislative history as to paragraph (8). The precursor of paragraph (8)(B) was originated by the Senate Committee on Finance in 1979. H.R. 3434, 96th Cong., 1st Sess., 125 Cong. Rec. S15111 (daily ed. Oct. 29, 1979). The Committee was concerned that, in the absence of any reporting requirement, and with no penalty for failing to report income timely, AFDC recipients had no incentive to report earnings and, conse-

quently, a high rate of overpayment was occurring on a regular basis:

> Quality Control reviews show that a large percentage of the payment errors made in the AFDC program relate to earned income and the failure of the recipient to report the correct amount of any changes in amount earned.... A few States require that all income be reported on a monthly basis, as a condition of eligibility. Most States do not do this. When they learn that a recipient had unreported income in prior months, they give him the benefit of all the earned income disregards provided in law in calculating the amount of the overpayment. Thus, if a recipient is negligent in reporting his earnings even over a long period of time there is no penalty involved.

S.Rep. 96–336, 96th Cong., 1st Sess. 89 (1979), U.S.Code Cong. & Admin.News 1980, pp. 1448, 1538.

Although the House version of the same bill did not contain a penalty provision, the Conference Committee agreed to such a provision, with some modifications. H.R. Rep. 96–900, 96th Cong., 2d Sess. 65 (1980). Enacted as Public Law 96–272 (1980), the statute denied income disregards as to the earned income of specified persons where there was "a failure without good cause to make a timely report (as prescribed by the State plan) to the State agency." 42 U.S.C. § 602(a)(8)(E)(1980). This earlier version of the penalty provision, prior to the adoption of a federal requirement of monthly reports, obviously committed the determination of timeliness to the discretion of each State.

In 1981, Congress adopted a uniform monthly reporting requirement, codified in section 602(a)(14). A cross-reference to the new paragraph was added to the paragraph (8) penalty provision: "a timely report (as prescribed by the State plan *pursuant to paragraph (14)*)." 42 U.S.C. § 602(a)(8)(B)(i)(III). The legislative history of the 1981 amendment to paragraph (8) appears to consist solely of the statement that income disregards do not apply to persons "who fail to report their earnings." S.Rep. 97–139, 97th Cong., 1st Sess. 501 (1981); H.R. Rep. 97–158, 97th Cong., 1st

Sess. 292 (1981), U.S.Code Cong. & Admin. News 1981, pp. 396, 767. Congress made massive changes to the income disregards formula, so that paragraph (8) had to be completely rewritten, but the penalty provision itself remained unchanged except for the addition of a cross-reference to paragraph (14) and changes in numbering, by which paragraph (8)(E) became (8)(B).

Plaintiffs argue that Congress intended to limit the penalty to income "never reported" to the State. This argument is unavailing. The legislative history shows congressional intent to motivate AFDC recipients to report *all* earned income "on a prompt and complete basis." S.Rep. 96–336, 96th Cong., 1st Sess., 89 (1979), U.S. Code Cong. & Admin.News 1980, p. 1538. Income not reported "in prior months," S.Rep. 96–336 at 89, logically includes the budget month, as well as earlier months, since the budget month is prior to the report month. Failure to file a timely report pursuant to the State plan thus constitutes failure to report that income and necessarily gives rise to application of the penalty provision.

Put bluntly, there is nothing in the legislative history to support plaintiffs' argument that the State must select a single date by which reports must be filed in order to be timely, and by which reports will be accepted for purposes of continued eligibility.

### D. *Agency Interpretation*

To the degree that the word "timely" is, under the circumstances ambiguous, textual examination of the balance of the section suggests that the Congress left it to the States to define "timeliness," a resolution relatively consistent with the pertinent sections' history. Thus, HEW's resolution of the inherent ambiguity of the term "timeliness" by delegating power to the States to set a time for filing is certainly a linguistically permissible reading and does not inherently frustrate congressional purpose. Accordingly, deference must be given to the Secretary's determination, and such deference supports the conclusion otherwise reached above.

## VI

### CONCLUSION

Congress' primary goal in establishing and maintaining the AFDC program was to provide economic security for needy children in their own homes or in the homes of relatives. 42 U.S.C. § 601; *Van Lare v. Hurley,* 421 U.S. 338, 345, 95 S.Ct. 1741, 1746, 44 L.Ed.2d 208 (1975); *McCoog v. Hegstrom,* 690 F.2d 1280, 1287 (9th Cir. 1982). Congress has, at the same time, expressed its desire to provide that economic security for needy children in a manner that maximizes the independence of the care-givers. 42 U.S.C. § 601. Recently, Congress has sought ways to provide benefits for children while reducing federal expenditures. *Turner,* 470 U.S. at 205, 208, 105 S.Ct. at 1149, 1151. Individual provisions of the Social Security Act may address any one of these goals.

In the case before me, I am required to conclude that under 42 U.S.C. section 602(-a)(8)(B)(i)(III), California was given power to define the requirement for timely filing within the report month. I cannot find that the date selected by the State is inconsistent with the statute. It is certainly true that the economic security of needy children is not fostered by imposing a penalty that deprives working parents of the benefit of income disregards. It is equally true that the independence of working parents is not encouraged by a rigid reporting requirement that functions as a trap for the unwary. Indeed, the named plaintiffs in this action have demonstrated that the State's policy left them with less than the State-determined amount necessary for subsistence needs. Nonetheless, the State's policy is not inconsistent with the congressional goal of saving money. Issues relating to standards of need and level of benefits have traditionally been left to the discretion of the States, *Rosado,* 397 U.S. at 408, 90 S.Ct. at 1216; *King,* 392 U.S. at 318–19, 88 S.Ct. at 2133–34, and the devastating truth is that few States, if any, define need at, much less above, the poverty level. *Rosado,* 397 U.S. at 408 n. 12, 90 S.Ct. at 1216 n. 12. As all courts must with regard to the AFDC program, I "hesitate to tell Congress that it might have achieved its budgetary objectives" in some other way. *Turner,* 470 U.S. at 206, 105 S.Ct. at 1150.

Having found as I have, I have done my duty as a judge. I must question, however, whether those in the State have done their duty as human beings dealing with human misery. Nonetheless, that question is not for me to resolve in this case.

For all of these reasons, IT IS HEREBY ORDERED:

1. the order certifying a class in this case is VACATED;
2. plaintiffs' motion for summary judgment is DENIED; and
3. defendants' motion is GRANTED.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.