CATHOLIC SOCIAL SERVICES, INC. (Centro De Guadalupe Immigration Center), et al., Plaintiffs,

v.

Edwin MEESE, III, etc., Defendants.

No. CIV S–86–1343 LKK.

United States District Court, E.D. California.

May 3, 1988.

Ralph Santiago Abascal, Stephen Rosenbaum, Jose R. Padilla, California Rural Legal Assistance, Inc., San Francisco, Cal., Ricardo Cordova, California Rural Legal Assistance, Inc., Modesto, Cal., Peter A. Schey, National Center for Immigrants' Rights, Inc., Los Angeles, Cal., Elizabeth Sandoval, Catholic Social Services, Inc., Centro Guadalupe Immigration Center, Sacramento, Cal., Michael Rubin, Altshuler & Berzon, Robert Rubin, Ignatius Bau, National Refugee Rights Project, San Francisco Lawyers' Committee for Urban Affairs, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for plaintiffs.

Glyndell Williams, Sp. Asst. U.S. Atty., Immigration & Naturalization Service, Sacramento, Cal., Robert Kendall, Eileen A. Carty, Office of Immigration Litigation, Dept. of Justice, Washington, D.C., for defendants.

## ORDER

KARLTON, Chief Judge.

This matter is before the court on plaintiffs' motion to amend the class definition and on cross-motions for summary judgment. Defendant has also filed a motion to dismiss plaintiffs' claims under section 210 of the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), on the grounds that those claims are moot. In this order, I resolve the motion for summary judgment relative to plaintiffs' claim concerning applicants for legalization under section 245A of the INA, as amended by IRCA (codified at 8 U.S.C. § 1255a, hereinafter referred to as "§ 245A"). The issues regarding claims under section 210, the Administrative Procedure Act, and class certification will be resolved in separate orders.

■ I turn to the merits of plaintiffs' claim.[1] Plaintiffs challenge the INS' interpretation of § 245A(a)(3)[2], as manifested by its regulations implementing that section. Specifically, plaintiffs challenge the INS' interpretation of the phrase "brief, casual and innocent."

On November 14, 1986, the INS issued a nationwide telex which provided, *inter alia*, that "[a]n alien who makes an unauthorized departure and illegal reentry after [November 6, 1986] shall be considered to have broken his period of continuous physical presence and thus will be ineligible for legalization under Section 245A." Plaintiffs' Exhibit A, at 15. In the final regulations, issued May 1, 1987, the INS waived this condition for section 245A-eligible aliens who reentered the U.S. prior to May 1, 1987. 52 Fed.Reg. 16206, 16208 (1987). However, the final regulations define "brief, casual and innocent" as "a departure authorized by the Service (advance parole) subsequent to May 1, 1987 of not more than thirty (30) days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control." *Id.* at 16208-09 (to be codified at 8 C.F.R. § 245a.1(g)). It is this interpretation of "brief, casual and innocent" as including only departures authorized pursuant to INS' advance parole procedures that is challenged here.

In order to determine whether the regulation conforms to the statute, the court must first determine the statute's meaning. Although in a previous opinion in this case, *Catholic Social Services, Inc. v. Meese*, 664 F.Supp. 1378, 1382-83 (E.D.Cal.1987) (hereinafter "CSS"), I discussed at length relevant standards of statutory construction, it

---

1. Defendant has objected to the court considering the motions for summary judgment as relating to the sixth amended complaint, which was filed after the summary judgment motion. Defendant argues that the sixth amended complaint introduces a new issue and new factual circumstances, i.e., aliens who entered the country "lawfully" but without advance parole, and that he will be prejudiced if he is not given an opportunity to conduct discovery and address the issue of "lawful" entries in this context. Defendant's contention is without merit. Plaintiffs have consistently, throughout the course of this litigation, challenged the INS' interpretation of the "brief, casual and innocent" absence exception to the continuous physical presence requirement of section 245A(a)(3). The addition of new plaintiffs who entered the United States by use of a border crossing card, but without advance parole, does not change the substantive

legal issue presented by the summary judgment motion.

2. That section provides: "(3) *Continuous Physical Presence Since November 6, 1986*—(A) *In General*—The alien must establish that the alien has been continuously physically present in the United States since November 6, 1986. (B) *Treatment of Brief, Casual and Innocent Absences*—An alien shall not be considered to have failed to maintain continuous physical presence in the United States for purposes of subparagraph (A) by virtue of brief, casual and innocent absences from the United States. (C) *Admissions*—Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this subsection.

seems appropriate to delineate the appropriate method of proceeding here as well.

■ The task for a court confronted with a challenge to an administrative agency's construction of a statute is to ascertain congressional intent, for it is the duty of both the court and the agency to give effect to that intent. *INS v. Cardoza-Fonseca*, 480 U.S. 421, —— n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987). "The first step of any district court in resolving a matter turning on statutory construction is to determine if there is binding authority construing the statute." *Tello v. McMahon*, 677 F.Supp. 1436, 1441 (E.D.Cal.1988). In the absence of such authority, the court employs a sequential process, first applying the plain meaning rule to the statutory language and then, if necessary, looking to the legislative history. *CSS* at 1383. If the statutory language is "clear and unambiguous," *id.*, the court looks to the legislative history only to determine whether there is "clearly expressed legislative intention" contrary to the plain language of the statute. *Cardoza-Fonseca*, 480 U.S. at —— n. 12, 107 S.Ct. at 1213 n. 12.[3]

■ If congressional intent can be ascertained using these "traditional tools of statutory construction," the question for the court is whether the agency's regulation is "fully consistent" with that intent. *National Labor Relations Board v. United Food and Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. ——, ——, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429, 441 (1987). On the other hand, if the initial analysis demonstrates that the statute is silent or contains an unresolved ambiguity as to the issue tendered, the court must resort to textual aids to construction and then to extrinsic aids, including examination of the agency's interpretation. *CSS*, at 1382–83. If there is such an ambiguity, the administrative interpretation, while not conclusive, is entitled to deference if the interpretation is a linguistically possible one and is consistent with the statutory purpose. *Young v. Community Nutrition Inst.*, 476 U.S. 974, 981–82, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986). If the administrative interpretation is "based on permissible construction of the statute," *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), it may be deferred to even if "the agency construction was [not] the only one it permissibly could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11. Factors to be considered in weighing the degree of deference to be afforded an agency interpretation include "the consistency with which an agency interpretation has been applied, and whether the interpretation was contemporaneous with the enactment of the statute being construed." *United Food and Commercial Workers Union*, 484 U.S. at —— n. 20, 108 S.Ct. at 421 n. 20, 98 L.Ed.2d at 442 n. 20; *see also Sierra Club v. Watt*, 608 F.Supp. 305, 331 n. 48 (E.D.Cal.1985).

Applying the steps enumerated above, I determine below that the plain meaning rule does not resolve this case. Moreover, although the legislative history does provide significant evidence of legislative intent, it is not completely dispositive. Nonetheless, as I explain, the regulation in question will not be deferred to because the phrase "brief, casual and innocent" has not been consistently interpreted by the agency, and the regulation is inconsistent with the liberal construction of the statute contemplated by Congress, is inconsistent with the historic meaning of the phrase which was likely to have been the meaning Congress intended, and overall appears to frustrate rather than implement congressional intention.

I

*Plain Meaning*

Since there is no binding construction of the statute at bar, in accordance with the

---

3. The plain meaning rule does not bar examination of the legislative history, *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed. 2d 80 (1981), but "[v]ery strong evidence, if not explicit language, from the legislative history is necessary to overcome the plain meaning naturally to be drawn from the language of a statute." *Tello v. McMahon*, 677 F.Supp. at 1441.

sequential process, I first examine the statute's language to determine if it is dispositive. It appears to the court that application of the plain meaning rule does not provide a clear resolution of the issue tendered. The phrase "brief, casual, and innocent" is not defined in the statute itself. *See Chevron U.S.A.*, 467 U.S. at 851, 104 S.Ct. at 2786; *Sacramento Regional County Sanitation Dist. v. Thomas*, 668 F.Supp. 1427, 1431 (E.D.Cal.1987). ("[W]hen Congress defines a term in a statute, that term is plain, and application of the plain meaning rule requires that term be given its statutorily defined meaning.") Nor does the phrase have a single clearly applicable "ordinary" or "normal" meaning which is readily discernible from the words themselves. *Cf. Garcia v. United States*, 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984). Each of the words in the phrase has a variety of meanings and the statute itself does not provide a limiting construction of either the individual words or the entire phrase.

## II

### *Legislative History*

■ Given the determination above, I next turn to the legislative history. Examination of that history strongly suggests that the phrase "brief, casual, and innocent" has a historic meaning and that Congress intended to adopt that meaning when employing the phrase in IRCA. To demonstrate that proposition, it is necessary to examine the legislative history dealing with the amendments relating to suspension of deportation, since it is in that context that the meaning of the term has developed.

In section 315 of IRCA, Congress amended section 244(b) of the INA, 8 U.S.C. § 1254(b), the section governing suspension of deportation, by adding the following provision:

(3) An alien shall not be considered to have failed to maintain continuous physical presence in the United States under paragraphs (1) and (2) of subsection (a) if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence.

The legislative history of this section specifically notes that:

The Committee Amendment relaxes the recent Supreme Court interpretation with respect to the seven years "continuous physical" residence requirement to qualify for suspension of deportation under section 244 of the Immigration and Nationality Act (*INS v. Phinpathya*, [464 U.S. 183] 104 S.Ct. 584 [78 L.Ed.2d 401] (1984)). That decision held that any departure from the U.S. during the seven year period was interruptive of the residence requirement, thus making the alien ineligible for relief. This Amendment relaxes the residence requirement in the case of a "brief, casual, and innocent" departure from the U.S.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5682.

Congress used the same phrase in the amendment to the suspension of deportation statute as it did in section 245A.[4] "It is a well-established principle of statutory construction that 'the same words or phrases are presumed to have the same meaning when used in different parts of the statute.'" *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 703 n. 11 (9th Cir.1981), *quoting Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir.1978); *see also Metropolitan Life Insurance Company v. Taylor*, 481 U.S. ——, ——, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55, 64 ("presumption that similar language in two labor law statutes has a similar meaning ... fully confirmed by the legislative history"). The presumption is rebut-

---

4. The fact that Congress used *additional* language in the suspension of deportation context ("and did not meaningfully interrupt the continuous physical presence") is not significant for the examination undertaken here. As the legal meaning of the phrase "brief, casual and innocent" developed, it came to be used as an exposition of the circumstances under which a meaningful interruption of physical presence did not occur; *see* section IV, *infra*; thus, it is the parallel use of "brief, casual and innocent" that is instructive.

ted only by a showing that "the same phrases are used in *'different* parts of the statute with manifestly different intent.'" *U.S. v. Various Slot Machines on Guam,* 658 F.2d at 703 n. 11. Here, there is no evidence that Congress intended the phrase "brief, casual and innocent" to have different meanings in different sections of IRCA; indeed, the evidence is to the contrary.

That the Congress was well aware of the historic meaning of the phrase "brief, casual and innocent" it employed in both sections is reinforced elsewhere in the history. Thus in comments on use of the phrase in section 245A, John R. Bolton, Assistant Attorney General, in a letter dated June 4, 1986, to the Chairman of the House Judiciary Committee, wrote:

> The Administration also believes that the provisions relating to "brief, casual and innocent absences from the United States will be extremely difficult to administer. Application of this standard is not supported by *Rosenberg v. Fleuti,* 374 U.S. 449 [83 S.Ct. 1804, 10 L.Ed.2d 1000] (1963). *Fleuti* applied only to lawful permanent resident aliens, not aliens illegally in the United States. We suggest that absences of a specific period of time, i.e., no more than fifteen days in the aggregate, from the date chosen for legalization, constitute the qualifying limit. The bill should also specifically state that absences related to violations of the immigration laws would automatically interrupt the physical presence requirement, regardless of the period of absence.

H.R.Rep. No. 682(I), at 116, 1986 U.S.Code Cong. & Ad.News at 5720. The comments in his letter with respect to section 244(b) are substantially similar:

> This amendment would overrule *INS v. Phinpathya,* [464 U.S. 183] 104 S.Ct. 584 [78 L.Ed.2d 401] (1984), which held that any absence, however, [sic] brief, breaks the continuity of physical presence.

We oppose this amendment because its vagueness invites judicial lawmaking and encourages litigation. We recommend either deleting this provision or amending it to preclude the establishment of continuous physical presence if the alien's departure is 15 days or longer or where the alien has engaged in activities contrary to the immigration laws.

*Id.* at 124, 1986 U.S.Code Cong. & Ad.News at 5728.[5]

The legislative history above, while it does suggest that Congress was aware that the phrase "brief, casual and innocent" had a historic meaning, does not itself resolve the meaning of the phrase. Nonetheless, that historical context significantly aids in construing the statute because "'[w]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.'" *Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978), *quoting Standard Oil v. United States,* 221 U.S. 1, 59, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911).

It is unclear to the court whether under the sequential method of statutory construction, the historic meaning of a term when specifically recognized in the legislative history, should be treated as legislative history or merely as an extrinsic aid to construction. Because legislative history may suffice to foreclose further analysis, the court believes that discretion is the better part of valor, and it is more appropriate to treat it as an extrinsic aid, thus insuring further analysis. By treating the historic meaning of the phrase as an extrinsic aid to construction, I thus conclude that neither application of the plain meaning rule nor examination of the legislative history is dispositive of the issue at bar. Accordingly, application of other aids to construction are required. Given my determination to treat the historic meaning of the

---

**5.** The references to *Fleuti* and *Phinpathya* in the Assistant Attorney General's letter to the Committee demonstrates that the entire course of development of the phrase "brief, casual and innocent" was before the legislature since, as is described in section IV, *infra,* the doctrine was first enunciated in *Fleuti* and rejected in the suspension of deportation context in *Phinpathya.*

phrase as an extrinsic aid, I will defer further exposition of that meaning to that portion of the opinion (see § IV, *infra*).

Before applying various extrinsic aids to resolution of the statute's meaning, however, I must now recognize that the legislative history provides very specific guidance for interpretation of the legalization program implemented by Congress in IRCA. The House Report specifically declares that:

> The Committee intends that the legalization program should be implemented in a liberal and generous fashion, as has been the historical pattern with other forms of administrative relief granted by Congress. Such implementation is necessary to insure the true resolution of the problem and to insure that the program will be a one-time-only program.

H.R.Rep. No. 682(I) at 72, 1986 U.S.Code Cong. & Ad.News at 5676.[6]

Thus, any construction of the statute requires a generous and liberal interpretation. With this admonition in mind, I now turn to determining whether this case may be resolved by deferring to the agency's interpretation as embodied in its regulations.

## III

### Agency Interpretation

The final regulation defines "brief, casual and innocent" as "a departure authorized by the Service (advance parole) *subsequent to May 1, 1987* of not more than thirty (30) days for legitimate emergency or humanitarian purposes ..." (emphasis added). 52 Fed.Reg. 16208–09 (to be codified at 8 C.F.R. § 245a.1(g)). Rather than providing a generous and liberal reading, the regulation construes the statute's reach in a very narrow manner. In that sense, it can be said that the administrative interpretation does not stand on a "permissible"

basis within the meaning of *Chevron, U.S.A.*. Even if the agency's interpretation stood on firmer ground, however, I do not believe deference is appropriate under the circumstances.

First it must be noted that the regulation simply finds no support in the text of the statute. Thus, there is no basis in the statute for differentiating between "brief, casual and innocent absences" which took place prior to May 1, 1987, and those which occurred after that date. The statute provides that 245A–eligible aliens must establish that they have been continuously physically present in the United States, except for "brief, casual and innocent" absences, since November 6, 1986, the date of enactment. Sections 245A(a)(3)(A) & (B). Put another way, eligible aliens may have "brief, casual and innocent" absences between November 6, 1986, and the date they file their applications. While May 1, 1987 is the date the application period started, *see* § 245A(a)(1)(A), there is no statutory basis for distinguishing between "brief, casual and innocent" absences that occurred during the preapplication period (between November 6, 1986 and May 1, 1987) and those that occurred after the application period started.

█ Any possible reading of the Attorney General's final regulation leads to a result that is inconsistent with the Congressional purpose. If the regulation is interpreted as permitting all otherwise eligible aliens inside the United States as of May 1, 1987, to obtain legalization without consideration of absences from the United States between November 6, 1987 and May 1, 1987, the Attorney General has in effect voided the continuous physical presence requirement during the preapplication period. If, on the other hand, the regulation is interpreted literally, i.e., that an alien must establish that he has been continuously physically present in the U.S. since Novem-

---

**6.** The need to interpret liberally in order to insure a one-time-only program grew out of the Committee's recognition that "any equitable proposal for immigration reform must address the large population of undocumented aliens living and working in the United States, many for a long period of time. Therefore, the bill requires the Attorney General to grant legal status to those aliens who have been in the United States a substantial number of years, have developed equities here, and have abided by the laws of this country." *Id.* at 71, 1986 U.S.Code Cong. & Ad.News at 5675.

ber 6, 1986, except for absences authorized by the INS after May 1, 1987, then it reads the "brief, casual and innocent" absence exception out of the statute entirely during the preapplication period. Neither construction of the regulation is consistent with the plain language of the statute. Under these circumstances, it is not clear that the regulation is a linguistically permissible interpretation of the statute so that deference is even possible.

The conclusion that Congress did not intend the exception to encompass only absences authorized by INS is reinforced by consideration of other provisions of the statute. Central to understanding this aspect of the congressional scheme is accepting the full implication of the fact that this statute is a "legalization" program, i.e., that it provides rights to people who are presently in an illegal status. Given this understanding, the statute reflects congressional recognition that the legalization program might fail because of the illegal alien's natural fear of the Immigration Service. Under such circumstances, interpreting the phrase "brief, casual and innocent" to require advance parole is simply inconsistent with that congressional perception.

The section 245A legalization program extends to aliens who have resided continuously in the United States in an unlawful status since January 1, 1982. The statute provides that applications for legalization may be filed either with the Attorney General or with qualified designated entities ("QDEs"). See § 245A(c). The House Report explains the decision to use QDEs as part of the legalization program, as follows:

The Committee has learned that legalization programs in other countries have usually produced a low rate of participation among the eligible candidates. At least part of the reason is distrust of

authority and lack of understanding among the undocumented population. The Committee hopes that by working through the voluntary agencies, the Attorney General might be able to encourage participation among undocumented aliens who fear coming forward. To assist in this endeavor, the bill authorizes the Attorney General to fund outreach serve and provides for an extensive education and outreach program prior to the application period.

H.R.Rep. No. 682(I) at 73, 1986 U.S.Code Cong. & Ad.News at 5677. The statute also has strict confidentiality provisions which prohibit the Attorney General from gaining access to QDE files and records regarding an alien's request for assistance with the legalization process without such alien's consent. Section 245A(c)(4). These provisions are "meant to assure applicants that the legalization process is serious and not a ruse to invite undocumented aliens to come forward only to be snared by the INS." H.R.Rep. No. 682(I) at 73, 1986 U.S.Code Cong. & Ad.News at 5677. This express recognition of and concern about the problem of getting undocumented aliens to come forward to participate in the program makes it highly unlikely that Congress intended to require such aliens to seek INS permission to leave the country prior to the time their legalization applications were filed.

Other aspects of IRCA also suggest that the regulation is faulty. The statute makes frequent and express references to authorization for certain activities and to advance parole throughout section 245A.[7] These provisions demonstrate that Congress knew about the process and could have written similar language into section 245A(a)(3) if it had intended to impose such a condition on the "brief, casual and inno-

7. The Attorney General is required to authorize certain trips abroad for successful applicants during their period of temporary residency. See § 245A(b)(3)(A). By contrast, there is no reference to "authorization" for travel during the application period. The statute also expressly directs the Attorney General to exclude absences under a grant of advance parole from the aggregate period of time that breaks the period of continuous residence required to establish eligibility. See § 245A(g)(1)(A) & (2)(B)(ii). Further, the Attorney General is directed to provide employment authorization to eligible aliens during both the preapplication and the application period, §§ 245A(e)(1)(B) & (2)(B), as well as during the period of temporary residence, § 245A(b)(3)(B).

cent" absence exception to the physical residence requirement. *See, e.g., Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 614, 64 S.Ct. 1215, 1219, 88 L.Ed. 1488 (1944).

Finally, deference is inappropriate because the Attorney General has not interpreted the phrase in a consistent manner. As noted above (*see* § II), the Assistant Attorney General, in his letter to the House Committee, fully recognized that the term "brief, casual and innocent" had a historic meaning and was being used by the Congress consistent with that meaning. As I explain in section IV, *infra*, that meaning certainly was not restricted to INS authorized departures. Thus, the Attorney General's regulation is not only inconsistent with the department's previous understanding of the language, it in effect sought to limit the meaning of the phrase, a result which Congress had rejected.

Moreover, the INS has not interpreted the phrase consistently throughout the statutory scheme. As noted above, the Congress also used the "brief, casual and innocent" language in its amendment to the suspension of deportation statute. IRCA § 315(b). In response to requests for admissions served by the plaintiffs in this litigation, the INS has admitted that "it is the policy of the INS that 'brief, casual and innocent' absences, including absences followed by reentry without inspection, do not automatically make aliens ineligible for suspension of deportation under 8 U.S.C. § 1244, as amended by IRCA section 315(b)." Plaintiffs' Exhibit PPPP; Defendant's Responses to Plaintiffs' Request for Admission, Response # 6. By contrast, only absences authorized by INS are "brief, casual and innocent" for purposes of section 245A. 8 C.F.R. § 245a.1(g). As noted in section II, *supra*, there is no basis

in the statute for construing the identical language in the two sections differently.

The defense argues that the determination that the INS may not deny a legalization application solely on the basis of an unauthorized absence from the country that is otherwise "brief, casual and innocent" contravenes section 245A(a)(3)(C). The court cannot agree. That section provides "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this subsection." The full implications of that section need not be resolved here and I do not do so. It may be that the practical effect of that section is to require denial of legalization to otherwise eligible aliens who are caught returning from a brief trip outside the United States [8], while at the same time preserving the right to legalization for those who successfully evade the INS on their return. If that is indeed the practical effect of the provision, it must be read in the context of a program to extend legalization to aliens who have been in this country unlawfully for over five years, and who Congress believed would have particular distrust of and fear of the INS because of the nature of such an existence. Whatever else this section may imply, it does not justify a regulation which, as a practical matter, itself virtually nullifies the "brief, casual and innocent" absence exception to the continuous physical presence requirement. For all the above reasons, the court simply cannot give any deference to the agency's interpretation.

### IV

### *The Historic Meaning of The Phrase*

Given the court's inability to defer to the agency's view, I turn to another extrinsic

---

**8.** Judge Lynch, of the Northern District of California, found that new regulations which require denial of parole for those aliens who apply for parole "for the sole purpose of seeking" legalization under IRCA, Amendment 15, 52 Fed.Reg. 16,194 (1987) (to be codified at 8 C.F.R. § 212.5(b)), were inapplicable to an alien whose "long-standing residence and family ties here almost certainly were his primary motiva-

tions" for requesting parole. *Gutierrez v. Ilchert,* 682 F.Supp. 467, 471–72 (N.D.Cal.1988), Plaintiffs' Exhibit QQQQ. Similarly, an alternative interpretation of section 245A(a)(3)(C) might limit the application of that section to aliens who seek admission for the express purpose of applying for legalization, as opposed to those whose purpose in returning is to rejoin their families or to return to established jobs.

aid to statutory construction, which does provide substantially more guidance in construing the phrase. As noted above, the phrase "brief, casual, and innocent" had a meaning which developed in immigration case law over a 21–year period, beginning with the Supreme Court's decision in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). In *Fleuti*, the Supreme Court held that a permanent resident alien who had made an afternoon trip to Mexico had not made an "entry" within the meaning of § 101(a)(13) of the INA, 8 U.S.C. § 1101(a)(13) and therefore was not excludable.[9] The Court held that such a trip, if it was "innocent, casual, and brief" was not an "intended" departure within the meaning of the statute. *Id.* at 461, 83 S.Ct. at 1811–12. The Court relied in part upon the "general purpose of Congress in enacting § 101(a)(13) to ameliorate the severe effects of the strict 'entry' doctrine." *Fleuti* at 461–62, 83 S.Ct. at 1812. It concluded that the exception to § 101(a)(13) was construed "as meaning an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." *Id.* at 462, 83 S.Ct. at 1812. Factors relevant in finding such an interruption included the length of the absence, the purpose of the visit, and whether an object of the visit was to "accomplish some object ... contrary to some policy reflected in our immigration laws." *Id.*

The "brief, casual and innocent" absence doctrine was extended to cases involving suspension of deportation, provided for in 8 U.S.C. § 1254, in *Wadman v. INS*, 329 F.2d 812 (9th Cir.1964). In *Wadman*, the Ninth Circuit was required to decide if a five-day absence from the United States on a vacation in Mexico was interruptive of the seven-year period of continuous physical presence in the United States necessary to obtain a suspension of deportation. The circuit found that there was no significant

distinction between the concept of "entry" central to *Fleuti* and the "continuous physical presence" requirement they faced. *Id.* at 815–16. The court held that "continuous" was "no more subject to a hard and fast construction than is the term 'intended.' The question is whether the interruption, viewed in balance with its consequences, can be said to have been a significant one under the guides laid down in *Fleuti*." *Id.* at 816. The court also concluded that the question was one of fact, not of law. *Id.*

For our purposes, it is not unimportant to note that the court in *Wadman* held that strict construction of section 244 was "peculiarly inappropriate" because the apparent purpose of the section was to enable the Attorney General to "ameliorate hardship and injustice which otherwise would result from a strict and technical application of the law." *Id.* at 816–177. The court decided that a strict construction would frustrate this purpose, while a "liberal construction ... would simply tend to increase the scope of the Attorney General's review and thus his power to act in amelioration of hardship." *Id.* at 817. The similarity between the congressional purpose in section 244 as described in *Wadman* and that underlying section 245A of IRCA is quite apparent.

While the "brief, casual and innocent" doctrine as it developed was not parsed as three separate tests, *see Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812, the "innocent" factor most logically would appear to refer to the purpose of the absence from the United States. If that purpose was to accomplish some object which was itself contrary to a policy reflected in the immigration laws, the absence would be regarded as "meaningful." Illegal entry or reentry into the United States, however, was not, without more, the type of unlawful conduct that would necessarily render an absence not innocent and therefore "meaningful." *See*

---

**9.** That section provided, in relevant part, that "an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney Gener-

al that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him." 8 U.S.C. § 1101(a)(13), *quoted in Fleuti*, 374 U.S. at 452, 83 S.Ct. at 1806.

*Git Foo Wong v. Immigration and Naturalization Service,* 358 F.2d 151, 153–54 (9th Cir.1966); *see also de Gallardo v. Immigration and Naturalization Service,* 624 F.2d 85, 87 (9th Cir.1980)[10]; *but see Heitland v. Immigration and Naturalization Service,* 551 F.2d 495, 503 (2d Cir.), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (using "implicitly deceptive methods to secure re-entry in the United States" was a "course of conduct directly contrary to a 'policy reflected in our immigration laws.' (citation omitted).")

Development of the "brief, casual and innocent" doctrine was halted by the Supreme Court's decision in *INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984). In *Phinpathya,* the Supreme Court held that the continuous physical presence requirement was to be applied literally, thus overruling the long line of appellate cases which had applied the *Fleuti* doctrine in the suspension of deportation context.[11] As noted above, Congress explicitly overruled *Phinpathya* when it amended the suspension of deportation statute in IRCA. The legislative history noted in section II, *supra,* plainly demonstrates that Congress intended to revive the "brief, casual and innocent" doctrine as it had developed in the case law.

■ My conclusion that Congress intended the phrase to be read against its histori-

cal context leads to resolution of the meaning of the term as used in section 245A. First, the question of whether an absence was brief, casual and innocent was one of fact to be resolved in a hearing, on a case-by-case basis, and thus was not subject to categorical definition by regulation. Such a result, moreover, seems consistent with recent Supreme Court evaluation of terms such as those in issue. As the high Court has recently explained, when there is some ambiguity in the terms which make up a standard, the terms "can only be given concrete meaning through a process of case-by-case adjudication." *Cardoza-Fonseca,* 480 U.S. 421, ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434, 458. In sum then, while the court cannot give definitive meaning to the statutory phrase outside its application to specific facts, it is possible for this court to find as a matter of law that the "brief, casual and innocent" doctrine is not properly limited to absences authorized by the INS.[12]

Given the requirement that the statute be construed liberally and generously, given the historic meaning of the phrase "brief, casual and innocent," given the statutory recognition of the natural reluctance illegals would feel in contacting the INS, and for all of these reasons explained above, plaintiffs' motion for summary judg-

10. *The logic of the proposition appears clear to this court. Given that the question arose in a suspension of deportation context, all departures and re-entries were likely to* vel non *violate the immigration laws. Thus if the innocence aspect of the test referred solely to the propriety of departure or re-entry, it would always be resolved against the alien; however, as noted, the test was intended to relieve the alien of application of the immigration law strictissimi juris.*

11. *In Phinpathya, the Court observed that Fleuti involved a lawful alien, while the case before it involved an unlawful alien "who could have been deported even had she remained in this country." Id. at 194, 104 S.Ct. at 592. The Court observed that "[s]uch an alien has no basis for expecting the Government to permit her to remain in the United States or to readmit her upon her return from foreign soil." Id. This distinction is plainly inapplicable to an interpretation of section 245A of IRCA, which by its terms applies only to aliens who have*

*been in an unlawful status from January 1, 1982 through the date of their application in order to qualify for legalization. Section 245A(a)(2)(A).*

12. *To be sure, the pre-Phinpathya case law concerning the "brief, casual and innocent" doctrine reflects uncertainty among the circuits as to whether the exception should be applied in the suspension of deportation context at all. See INS v. Phinpathya, 464 U.S. 183, 194 n. 12, 104 S.Ct. 584, 592 n. 12. As noted above, there are also disagreements about how the Fleuti factors should be applied. Nonetheless, neither set of disagreements prevents this court from concluding as a matter of law that "brief, casual and innocent" absences are not limited to those authorized by INS. The first disagreement has been resolved by the language of IRCA itself, which reflects congressional intent to apply the doctrine in this context. The second set of disagreements are to be resolved in the case-by-case adjudication of each application, recognizing the congressional directive that the statute be given a liberal and generous application.*

ment is GRANTED. The final regulation defining a "brief, casual and innocent" absence as one authorized by the INS is invalid as inconsistent with the statutory scheme and hence is unenforceable.[13]

IT IS SO ORDERED.

---

13. I have previously ordered the parties to brief the issue of whether additional relief is appropriate and available. The court will consider that matter in a subsequent order.