**UNITED STATES of America,**
**Plaintiff,**

v.

**Danny MILES, Defendant.**

**No. CR.S–95–325 WBS.**

United States District Court,
E.D. California.

Oct. 31, 2002.

Danny Miles, Sacramento, CA, pro se.

Allison Claire, Fed. Defender, Sacramento, CA, for Danny Miles.

Thomas Hopkins, U.S. Atty., Sacramento, CA, for U.S.

### MEMORANDUM AND ORDER

SHUBB, District Judge.

Defendant Danny Miles is currently on supervised release following his 1996 conviction for possession of a firearm by a convicted felon, 18 U.S.C. § 922(g). Defendant's probation officer directed him to submit a blood sample for deoxyribonucleic acid ("DNA") analysis pursuant to the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135. Defendant refused to appear for DNA testing, and consequently a petition was filed charging defendant with a violation of the conditions of his supervised release. Defendant now moves to dismiss the petition. Defendant has otherwise complied with all conditions of his supervised release, and would have successfully completed his term of supervision in August 2002.

### I. *Factual Background*

On December 19, 2000, Congress enacted the DNA Analysis Backlog Elimination Act of 2000. 42 U.S.C. § 14135; Pub.L. No. 106–546, 114 Stat. 2726 (Dec. 19, 2000)("The Act"). The Act provides, in pertinent part:

> The probation office responsible for the supervision under Federal law of an individual on probation, parole, or supervised release shall collect a DNA sample from each such individual who is, or has been, convicted of a qualifying Federal offense (as determined under subsection (d)). . . .

42 U.S.C. § 14135a(a)(2). "Qualifying federal offenses" are limited to certain categories of violent crime, including homicides, sex offenses, kidnaping, robbery, and con-

spiracies to commit those offenses. *See* 42 U.S.C. § 14135a(d).

The Act requires cooperation with the collection of a DNA sample as a condition of supervised release, and makes failure to cooperate a misdemeanor offense. *See* 42 U.S.C. §§ 14135c; 14135a(a)(5). The Act also authorizes the probation office responsible for the supervision to use reasonable means to detain, restrain, and collect samples from a person who refuses to give them voluntarily. *See* 42 U.S.C. § 14135a(a)(4)(A).

In addition, the Act requires the probation office to furnish each DNA sample to the Federal Bureau of Investigation for purposes of analysis and indexing in the Combined DNA Index System ("CODIS"). 42 U.S.C. § 14135a(b). CODIS is a national index of DNA samples taken from convicted offenders, crime scenes and victims of crime, and unidentified human remains that "enables law enforcement officials to link DNA evidence found at a crime scene with a suspect whose DNA is already on file." 146 Cong. Rec. S11645–02, S11647 (Dec. 6, 2000)(statement of Sen. Kohl); *see also* 42 U.S.C. § 14132(a); 106 H.R. 900. The Act further authorizes disclosure of a DNA sample or result to "criminal justice agencies for law enforcement identification purposes," in "judicial proceedings," and "for criminal defense purposes, to a defendant." 42 U.S.C. §§ 14135e(a)(b), 14132(b)(3).

The Act also provides a number of privacy protections, including limiting the use of the information, criminalizing the knowing, unauthorized retention or disclosure of a DNA sample, and expunging a person's DNA records upon proof that each of his convictions for a qualifying offense has been overturned. *See id;* 42 U.S.C. §§ 14135e(c), 14132(d).

In 1974, defendant was convicted of armed robbery, which is considered a "qualifying federal offense" under the Act.

28 C.F.R. § 28.2. He is currently serving a term of supervised release for a 1996 conviction for a non-qualifying federal offense, possession of a firearm by a convicted felon. Defendant contends that he is not required to submit to DNA testing under the Act because the offense for which he is currently under supervision is not a qualifying offense. Alternatively, defendant argues that the Act violates the Fourth Amendment, the Equal Protection Clause, and the Ex Post Facto Clause.

## II. *Discussion*

### A. *Interpretation of 42 U.S.C. § 14135a(a)(2)*

■ Whether the Act applies to defendant depends on what the meaning of "has been" is. The Act requires the probation office to collect a DNA sample from any individual on supervised release "who is, or has been, convicted of a qualifying Federal offense." 42 U.S.C. § 14135a(a)(2). Defendant interprets this provision to mean that DNA sampling is required of a supervisee who "is or has been" convicted of a qualifying offense, and is now under supervision for that offense. The government contends that the terms of the Act require testing of any supervisee who "is or has been" convicted of a qualifying offense, regardless of whether his current supervision is the result of his conviction for the qualifying offense.

The question of whether section 14135a(a)(2) covers people like defendant who are currently under supervision for a non-qualifying offense but who have been convicted of a qualifying offense in the past appears to be a matter of first impression. The court's analysis therefore begins, as it must, with the language of the statute itself. *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980); *Tello v. McMahon*, 677 F.Supp. 1436, 1441 (E.D.Cal.1988)(if there is no

binding authority construing statute, the court must undertake its own independent analysis beginning with examination of statutory text).

If the language of the statute is clear and unambiguous, it must ordinarily be regarded as conclusive. *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983). In the absence of textual ambiguity, the court may resort to other cannons of statutory construction only if there is "[v]ery strong evidence, if not explicit language from the legislative history" of Congressional intent contrary to the statute's plain meaning. *Tello,* 677 F.Supp. at 1441; *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987); *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983).

The language of section 14135a(a)(2) is plain. It applies without limitation or qualification to any person on supervised release who "is or has been convicted of a qualifying Federal offense." So long as the person is (1) under supervision, and (2) has been convicted of a qualifying offense, he must submit to DNA testing. Nothing on the face of the statute suggests a Congressional intent to restrict the Act's application only to people who have been convicted of a qualifying offense *for which they are now under supervision.* To arrive at the construction defendant urges, the court would have to insert a limitation into the statute that does not appear in its text. *See Burlington Northern,* 481 U.S. at 463, 107 S.Ct. 1855 ("Respondents' position depends upon the addition of words to a statutory provision which is complete as it stands. Adoption of their view would require amendment rather than construction of the statute, and it must be rejected here.")

*Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) is instructive on this point. The Supreme Court in *Lewis* construed a federal statute prohibiting any person who "has been convicted by a court of the United States or of a State . . . of a felony" from possessing a firearm. The Supreme Court rejected the defendant's argument that the statute did not apply to felony convictions subject to collateral attack:

> [The statute's] proscription is directed unambiguously at any person who "has been convicted by a court of the United States or of a State . . . of a felony." No modifier is present, and nothing suggests any restriction on the term "convicted." Nothing on the face of the statute suggests a congressional intent to limit its coverage to persons [whose convictions are not subject to collateral attack]. The statutory language is sweeping . . . .

*Id.* at 60–61, 100 S.Ct. 915.

The "has been convicted" language in section 14135a(a)(2) is similarly sweeping and unqualified. It carves out no exceptions, and it would be contrary to the plain meaning of the statute to recognize an exception in defendant's case.[1]

Defendant argues that the legislative history must inform the court's analysis. Defendant contends that because Congress appears not to have raised or debated the

---

1. Defendant makes much of the fact that the statute does not contain any reference to prior convictions or prior criminal history. However, this does not make section 14135a(a)(2) ambiguous. Ambiguity exists if "a statute is capable of being understood by reasonably well informed persons in two or more differ-

ent senses." Sutherland, Statutory Construction § 45.02 at 6 (5th ed.1992). Section 14132a(a)(2) by its terms unambiguously encompasses prior convictions for qualifying offenses, because its terms are not limited in any way.

question of whether DNA testing would be required based on a prior conviction, Congress "[cannot have] intended that the DNA collection provision would be applied on the basis of past criminal history." (Def's Brief at 8.) However, "[t]he facile attribution of Congressional 'forgetfulness' cannot justify .. a usurpation" by the judicial branch of Congress's legislative role. *West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 99–100, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The text of the Act itself is the best evidence of Congress's intent, *id.,* and the text provides for DNA testing regardless of when the qualifying offense occurred. Moreover, there is no evidence, let alone "very strong evidence" that Congress's intent was contrary to the plain meaning of the Act. *Tello,* 677 F.Supp. at 1441. This is not one of those "exceptional circumstances" in which the legislative history evidences a Congressional intent so inconsistent with the plain meaning of the statute that the court may resort to other cannons of statutory construction to adopt a different interpretation. *Burlington Northern,* 481 U.S. at 461, 107 S.Ct. 1855.

■ Defendant also urges the court to construe the Act so as to avoid constitutional questions, but "that course is appropriate only where the statute provides a fair alternative construction." *Lewis,* 445 U.S. at 65, 100 S.Ct. 915. Because section 14135a(a)(2) is unambiguous on its face, there is no justification for construing the statute in light of constitutional considerations. The plain language of the Act dictates that defendant must submit a DNA sample as a condition of his supervised release.[2]

## B. *Fourth Amendment*

■ Defendant alternatively contends that the Act, if applied to him, is unconstitutional under the Fourth Amendment because it requires him to submit to a blood test without any individualized suspicion that he has engaged in criminal wrongdoing other than the offense for which he has already been convicted. For the reasons that follow, the court agrees.

■ It is well settled that taking a blood sample constitutes a search under the Fourth Amendment. *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The question in this case is whether the non-consensual extraction of blood from defendant for DNA testing under the Act is reasonable, "for the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Id.* at 619, 109 S.Ct. 1402.[3]

In *Rise v. Oregon,* 59 F.3d 1556 (9th Cir.1995), the Ninth Circuit considered the constitutionality of a similar statute and found that it did not violate the Fourth Amendment. At issue in *Rise* was an Oregon statute requiring convicted mur-

---

**2.** The court's conclusion is bolstered by the fact that the Administrative Office of the United States Courts has interpreted the Act to apply to "any offender who has a previous federal conviction for any of the qualifying offenses...." (Dec. 14, 2001 Mem. From Administrative Office of the United States Courts to All Chief Probation Officers.) Where there is ambiguity in the text of a statute, the administrative interpretation of the statute is entitled to "great deference." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**3.** The Act does not preclude the use of means other than blood testing to obtain a sample of a convicted felon's DNA. The Act requires the collection of a "DNA sample," which is defined as "a tissue, fluid or other bodily sample of an individual on which DNA analysis can be carried out." 42 U.S.C. § 14135a(c)(1). Because defendant was specifically directed to submit to blood testing, the court is not called upon to express any opinion on the constitutionality of other means of collecting DNA samples under the Act.

derers and sex offenders to submit to blood testing for DNA analysis. At the outset, the Ninth Circuit rejected the petitioners' argument that because the purpose of Oregon's DNA statute was general law enforcement, probable cause or at least individualized suspicion was required for the search to be reasonable. Citing *Michigan State Police Department v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Ninth Circuit emphasized that "[e]ven in the law enforcement context, the State may interfere with an individual's Fourth Amendment interests with less than probable cause and without a warrant if the intrusion is only minimal and is justified by law enforcement purposes." *Id.* at 1559.

Accordingly, the Ninth Circuit went on to examine the intrusiveness of the search and the justifications for the search. It found that although drawing blood from "free persons" would generally require a warrant supported by probable cause, convicted felons as a class "do not have the same expectations of privacy in their identifying genetic information," because once convicted of a predicate offense, "[their] identity has become a matter of state interest and [they] have lost any legitimate expectation of privacy in the identifying information derived from the blood sampling." *Id.* at 1559–60. Because of the convicted felon's reduced expectation of privacy, and because drawing blood "constitutes only a minimally intrusive search," the Ninth Circuit found that it was appropriate to abandon the normal requirement of probable cause as well as the lesser requirement of individualized suspicion, "even if [the statute's] only objective is law enforcement." *Id.* at 1560; 1559.

Instead, the Ninth Circuit applied a balancing test in which it weighed "the gravity of the public interest served by the creation of a DNA data bank, the degree to which the data bank would advance the public interest, and the severity of the resulting interference with individual liberty." *Id.* at 1560. It found that a DNA bank was likely to advance the state's interests in solving crimes, in prosecuting crimes accurately, and in reducing recidivism. *Id.* at 1561. It also concluded that the infringement on convicted felons' liberty was minimal by comparison because the statute applied only to a limited class of offenders, it required no more than one blood extraction in a person's lifetime, sampling was to be done only by medical personnel and the samples could only be used in judicial proceedings and by certain law enforcement officers, the statute prohibited the state from analyzing the samples to discover genetic predispositions to physical or mental conditions, and it was applied evenhandedly. *Id.* at 1561–66. Accordingly, the Ninth Circuit ruled that Oregon's DNA statute was constitutional under the Fourth Amendment. *Id.* at 1562.

The government contends that *Rise* controls the court's decision in this case. Were it not for two more recent Supreme Court decisions, this court would be inclined to agree. However, the Supreme Court in *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) and *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) effectively overruled *Rise*.

In *Edmond*, the Court held that programmatic suspicionless searches cannot, as a general rule, be justified primarily by reference to general law enforcement needs. *Edmond* examined the constitutionality of Indianapolis's highway checkpoint program, which had as its primary purpose the discovery and interdiction of illegal narcotics. The Court "declin[ed] to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes."

*Edmond,* 531 U.S. at 43, 121 S.Ct. 447. The Court observed:

> [T]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue. *We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends.*

*Id.* at 42–43, 121 S.Ct. 447 (emphasis added).

In finding the Indianapolis checkpoint unconstitutional, the Court distinguished a number of other cases in which it had upheld programs of suspicionless searches on the grounds that those programs were all justified by reference to objectives other than ordinary law enforcement. *See id.* at 37–40 (citing cases.) Significantly, the Court explained that *Michigan State Police Department v. Sitz,* the case on which the Ninth Circuit relied to justify its departure from the usual individualized suspicion requirement, does *not* stand for the proposition that law enforcement needs can validate a program of suspicionless searches. According to *Edmond, Sitz* properly upheld a sobriety checkpoint program as constitutional not because the program was well-tailored to serve a law enforcement purpose, but because its primary objective was promoting highway safety by "reducing the immediate hazard posed by the presence of drunk drivers on the highways." *Id.* at 39, 121 S.Ct. 447. The Court also distinguished *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), another case on which the Ninth Circuit relied for its "balancing test," on the grounds that the program of drug and alcohol testing for railroad employees at issue in that case was related to the "special need beyond the normal need for law enforcement" of enforcing railroad safety regulations. *Id.* at 36, 121 S.Ct. 447.

· Thus, in *Edmond,* the Supreme Court flatly rejected *Rise*'s interpretation of *Sitz* and *Skinner,* and refused as a general rule to "credit the 'general interest in crime control' as justification for a regime of suspicionless [searches]." *Id.* at 42, 121 S.Ct. 447. The Court appeared to be willing to make an exception only where "some emergency" related to ordinary crime control might justify a program of stops or searches without individualized suspicion, such as a roadblock set up to thwart an imminent terrorist attack, or to stop a fleeing, dangerous criminal. *Id.* at 44, 121 S.Ct. 447.

*Rise* was further undermined by the Supreme Court's decision in *Ferguson,* 532 U.S. 67, 121 S.Ct. 1281. The Court in *Ferguson* struck down a hospital program in which hospital staff tested pregnant women for drug use and then turned the test results over to the police for use against the women in subsequent criminal prosecutions. The Court held that although the ultimate objective of the program was to deter drug use among pregnant women, the program was unconstitutional under the Fourth Amendment because its immediate objective was to generate evidence for law enforcement purposes. *Id.* at 83, 121 S.Ct. 1281. Ferguson thus reiterates *Edmond*'s skepticism over the validity of a program of suspicionless searches where the government's asserted need is its general interest in law enforcement. *See id.* at n. 20, 121 S.Ct. 1281 (noting that "[i]n none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes.")

In addition, *Ferguson* casts doubt on the Ninth Circuit's suggestion in *Rise* that it is appropriate to depart from the requirement of individualized suspicion because convicted felons as a class have a lesser expectation of privacy. In *Ferguson*, the Court took pains to distinguish *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), which held that special needs justified the warrantless search of a probationer's home based on less than probable cause. *Id.* at 79 n. 15, 121 S.Ct. 1281. The Court declined to interpret *Griffin* as upholding a special needs search that was directed toward general law enforcement:

> The dissent, ... relying on *Griffin*, argues that the special needs doctrine is 'ordinarily employe[d], precisely to enable searches *by law enforcement officials* who, of course, ordinarily have a law enforcement objective.' Viewed in the context of our special needs cases and even viewed in isolation, *Griffin* does not support the proposition for which the dissent invokes it.

*Id.* (internal citations omitted)(emphasis in original).

The Court in *Ferguson* suggested that *Griffin* is properly analyzed as holding that the search of the probationer's home was justified by reference to the special non-law enforcement needs of the probation system. Although the Court also mentioned that probationers have a lesser expectation of privacy than free persons generally, it distinguished *Griffin* primarily on the ground that the search in that case was justified by a purpose other than ordinary law enforcement. Thus, even in the context of probationers who have a lesser expectation of privacy because of their status, the Supreme Court has gone to great lengths to require something more than the assertion of a general law enforcement need to justify a regime of suspicionless searches.[4]

This court is aware of no Supreme Court case upholding a suspicionless search of inmates, probationers, or supervisees where the justification for the search was primarily law enforcement. The Court has justified such searches by reference to the government's interest in institutional security, order, and discipline, but never by reference to the government's law enforcement objectives. *See Bell v. Wolfish*, 441 U.S. 520, 559–60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)(routine searches of jail cells and body cavities appropriate because of strong interest in prison security); *Griffin*, 483 U.S. at 875, 107 S.Ct. 3164 (warrantless search of probationer's home justified on less than probable cause because of goals of probation system, including need for supervision and discipline); *see also Ferguson*, 532 U.S. at 67, 121 S.Ct. 1281 ("The traditional warrant and probable cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes") (Kennedy, J. concurring).[5]

---

**4.** *Edmond* is in accord. It is axiomatic that people have a lesser expectation of privacy in their cars, *see Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), yet under *Edmond* there still must ordinarily be individualized suspicion before they can be subjected to a car stop for general law enforcement purposes.

**5.** The government contends that *Ferguson* does not undermine *Rise* because *Ferguson* applied a "special needs" test, while *Rise* applied a Fourth Amendment balancing test. *Ferguson* is important not because of the test it applied, but because it supports the proposition that individualized suspicion is usually required in the context of searches conducted for general law enforcement purposes, even when the person being searched has a lesser expectation of privacy because of his status. In addition, it is not at all clear that *Rise* applied a Fourth Amendment balancing test as opposed to a "special needs" test. At least one lower court has interpreted *Rise* as hav

Accordingly, the government cannot avoid the import of *Edmond* and *Ferguson* by making the facile argument that those cases involved searches and seizures of free persons, while the searches in *Rise* and in this case involve convicted felons. Moreover, the notion expressed in *Rise* that persons convicted of qualifying offenses have no expectation of privacy in their identifying information has little application to defendant, who was convicted of a qualifying offense nearly thirty years ago and has fully served his sentence for that crime. Unlike defendant, the petitioners in *Rise* were under supervision for their qualifying offenses. Thus, they had more reason to expect that while they were under supervision they would be required to comply with conditions related to their qualifying offenses. Here, by contrast, there is no connection between defendant's current supervised release and his 1974 conviction for the qualifying offense.

The court cannot accept the government's argument that defendant's expectation of privacy was obliterated forever when he was convicted of a qualifying offense thirty years ago. Having fully served his sentence for that crime, defendant had an objectively reasonable expectation that after three decades the government would not be able to use that offense as a justification for invading his bodily integrity and obtaining his identifying information without some individualized suspicion of criminal wrongdoing.

The government next contends that *Edmond* and *Ferguson* have no application to this case because the DNA Act has a broader primary purpose than just uncovering evidence of ordinary criminal wrongdoing. Specifically, the government argues that the Act has the following objectives: (1) investigation and prosecution of past and future crimes; (2) ensuring the more accurate prosecution of crimes, for example by exonerating the innocent; and (3) preventing recidivism.

To determine the actual primary purpose of the Act, the court is not compelled to accept the government's retrospective justifications, but rather must examine all the available evidence. *Edmond*, 531 U.S. at 46–47, 121 S.Ct. 447. Thus, the court examines each of the asserted governmental interests to determine whether such interest is in fact an actual primary purpose of the Act and, if so, whether that interest can be distinguished from law enforcement.

The government's first asserted interest, the investigation and prosecution of crimes, is no different from a general law enforcement purpose. Much like the program struck down by the Supreme Court in *Ferguson*, the Act authorizes test results to be given to law enforcement officials and to be used in prosecutions. In fact, the Act's express purpose is to gather information for use in the CODIS database, which is designed to match felons' DNA information to DNA found at crime scenes.[6] Thus, the Act is specifically di-

---

ing applied a "special needs" test. *See United States v. Reynard*, 220 F.Supp.2d 1142 (S.D.Cal.2002).

**6.** In *United States v. Reynard*, 220 F.Supp.2d 1142 the court held that the purpose of expanding the CODIS database goes beyond normal law enforcement needs. The court finds *Reynard* unpersuasive on this point. CODIS was expressly created to solve crime, as acknowledged in the legislative history of the Act. *See* 146 Cong. Rec. H8572-01, *H8575-6 ("The purpose of this database is to match DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders. Clearly, the more samples we have in the system, the greater the likelihood we will come up with matches and solve cases.") It is intellectually dishonest to decouple the collection of information for use in CODIS from the law enforcement purpose for which CODIS was created.

rected toward gathering evidence to be used in solving and prosecuting crimes, which is clearly a law enforcement purpose.

The government's second asserted interest, advancing the accurate prosecution of crimes, does not withstand scrutiny. If a convicted felon wants to be exonerated of a crime for which he is wrongly accused, he will presumably submit voluntarily to a DNA test. The Act, however, compels convicted felons under supervision to give samples of their DNA against their will, and even authorizes the use of force or restraint to gather a DNA sample if they do not cooperate. It is disingenuous for the government to state that it needs to exonerate people who do not want to be exonerated.

In any case, the asserted interest in prosecuting crimes accurately is indistinguishable from the government's basic interest in enforcing the law. Any time the government attempts to solve or prosecute crime, the presumption is that the government's objective is to do so accurately. The accurate prosecution of crime is an inherent and implicit goal of the government's ordinary law enforcement objective.

Moreover, as a practical matter, there is no material difference between furthering law enforcement objectives and advancing the government's interest in accurate criminal prosecution. Defendant's DNA sample may demonstrate that he is innocent of a crime, but, like a good alibi, the sample would only eliminate him from the field of suspects under investigation. Alternatively, defendant's DNA sample may later prove that someone else is innocent of a crime, but only by providing evidence of defendant's guilt. Thus, the asserted interest in accurate prosecution is nothing more than the other side of the same law enforcement coin. The purpose served by the Act is "ultimately indistinguishable

from the general interest in crime control." *Edmond*, 531 U.S. at 45, 121 S.Ct. 447.

Finally, the government's third asserted interest, reducing recidivism, is collateral to the law enforcement purposes of the Act. The legislative history of the Act reflects that Congress was overwhelmingly concerned with expanding the CODIS database to promote accurate crime solving and prosecution, not with deterring convicted felons from committing crime in the future. *See* 146 Cong. Rec. H8572–01, at *H8574–H8575; H.R. Rep. 106–900(I), at *8–11; 23–27; 32–36. Any time the government implements a program requiring people to give evidence that may later be used against them in a criminal prosecution, the program may have a deterrent effect. *See Ferguson*, 532 U.S. at 83, 121 S.Ct. 1281 (noting that "law enforcement involvement always serves some broader social purpose or objective"); *Edmond*, 531 U.S. at 43, 121 S.Ct. 447 ("The detection and punishment of almost any criminal offense serves broadly the safety of the community"). However, those positive externalities are insufficient as a matter of law to take the program out of the realm of searches having a primary purpose of general law enforcement. *See Ferguson*, 532 U.S. at 83, 121 S.Ct. 1281; *Edmond*, 531 U.S. at 43, 121 S.Ct. 447.

Under *Ferguson*, a program of suspicionless searches cannot be justified by its ultimate purpose or effect of deterring harmful behavior if its immediate purpose is to gather evidence for use in investigating and prosecuting crime. *Ferguson*, 532 U.S. at 83, 121 S.Ct. 1281 (finding hospital's policy of drug testing pregnant women unconstitutional where "[t]he threat of law enforcement may ultimately have been intended as a means to an end [of getting women into substance abuse treatment and off drugs], but the direct and primary purpose of [the] policy was to ensure the

use of those means.") Because the Act authorizes suspicionless searches primarily for general law enforcement purposes, it is unconstitutional.[7]

The authorities cited by the government do not compel a different conclusion. The government cites a number of cases upholding DNA testing statutes under the Fourth Amendment, but none of those cases are binding on this court. All but three of those cases were decided before *Edmond* and *Ferguson* and therefore have no continued validity, for the reasons discussed above. *See Roe v. Marcotte*, 193 F.3d 72 (2d Cir.1999) (upholding Connecticut statute before *Edmond* and *Ferguson* decided); *Boling v. Romer*, 101 F.3d 1336 (10th Cir.1996) (upholding Colorado statute under Fourth Amendment); *Jones v. Murray*, 962 F.2d 302 (4th Cir.1992)(finding Virginia DNA statue constitutional under Fourth Amendment); *Kruger v. Erickson*, 875 F.Supp. 583, 588 n. 6 (D.Minn.1995)(Minnesota statute upheld); *Vanderlinden v. Kansas*, 874 F.Supp. 1210, 1214–15 (D.Kan.1995) (Kansas statute upheld); *Ryncarz v. Eikenberry*, 824 F.Supp. 1493, 1499 (E.D.Wash.1993)(upholding Washington statute).

Further, none of the three cases decided after *Edmond* and *Ferguson* are persuasive. *See United States v. Reynard*, 2002 WL 1988176 No. 98–CR–2402–IEG (S.D.Cal. Aug. 26, 2002)(holding, post *Edmond* and *Ferguson*, that the DNA Analysis Backlog Elimination Act of 2000 does not violate the Fourth Amendment); *United States v. Meier*, CR No. 97–72 HA, slip op. at 8–9 (D.Or. Aug. 6, 2002)(same); *Groceman v. United States Dept. of Justice*, 2002 WL 1398559, No. Civ. 301CV1619G (N.D.Tex. June 26, 2002)(same). Two of those cases, *United States v. Meier*, CR No. 97–72 HA, slip op. at 8–9 (D.Or. Aug. 6, 2002), and *Groceman v. United States Dept. of Justice*, 2002 WL 1398559, No. Civ. 301CV1619G (N.D.Tex. June 26, 2002), do not discuss the import of either *Edmond* or *Ferguson*. Rather, *Meier* and *Groceman* simply follow circuit court precedent with little or no independent analysis, and therefore are not particularly persuasive or useful here.[8]

The only case of which the court is aware that discusses the significance of *Edmond* and *Ferguson* in the context of DNA testing is *United States v. Reynard*, 220 F.Supp.2d 1142 (S.D.Cal.2002). There, Judge Gonzalez found the DNA Analysis Backlog Elimination Act of 2000 constitutional under the Fourth Amendment. Importantly, Judge Gonzalez reasoned that in light of *Ferguson*, the court could not undertake the kind of balancing employed in *Rise* without first determining whether the Act could be justified by reference to a purpose other than ordinary law enforcement. *Id.* at 1165, 1167 ("The Court must first determine whether the DNA Act authorizes searches that go beyond the normal need for law enforcement.") Judge Gonzalez concluded that *Rise* did "not control the disposition" of the case because "[*Rise*'s statement] that the Oregon statute was constitutional 'even if its only objective is law enforcement,' *Rise*, 59 F.3d at 1559 ... potentially conflicts with recent Supreme Court decisions suggesting that a statute will not fall within the 'special needs' exception if the statute's 'primary purpose' is the investigation of crimes." *Id.* at 1166 n. 29 (citing *Ferguson*, 532 U.S. 67, 80–85, 121 S.Ct. 1281.)

---

7. Because the court finds that the Act, as applied to defendant, is unconstitutional under the Fourth Amendment, the court does not address defendant's arguments that requiring him to submit a DNA sample would violate the Equal Protection Clause or Ex Post Facto Clause.

8. In addition, *Meier* is an unpublished order and therefore carries no weight.

Thus, while the ultimate result in *Reynard* is at odds with the result this court reaches today, *Reynard* is consistent with the notion that it is impermissible to justify a regime of suspicionless searches primarily by reference to normal law enforcement needs. The only difference between *Reynard* and the court's decision here is that in *Reynard* the court concluded that the Act's goals of ensuring accurate prosecution and creating a more complete DNA database were distinct from general law enforcement objectives. *See id.* at 1168–69. For the reasons discussed above, this court concludes otherwise.

### III. *Conclusion*

Defendant had served almost the full term of his supervised release without incident until he refused to submit a blood sample for DNA testing. This court, in the process of performing its supervisory function, was then asked to assist the government in gathering evidence for law enforcement purposes which have no relation to the purposes of supervised release. *See United States v. Vallejo,* 69 F.3d 992, 994 (9th Cir.1995)(stating that the purpose of supervised release is to protect the public and to facilitate the reintegration of defendants into the community).

The government has been unable to point to any primary purpose of the DNA Analysis Backlog Elimination Act of 2000, and the record before this court supports a finding of none, other than its use as a general law enforcement tool. This runs afoul of *Edmond* and *Ferguson.* It is a violation of defendant's Fourth Amendment rights to require him, without any individualized suspicion, to submit a blood sample under the Act.

IT IS THEREFORE ORDERED that defendant's motion to dismiss the petition charging violation of the conditions of su-

pervised release be, and the same hereby is, GRANTED.