**William Bernard VORE, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**No. CV 02–405 TUC DCB.**

United States District Court, D. Arizona.

Sept. 8, 2003.

William Bernard Vore, Pro se, FCI–Tucson, Tucson, AZ, for William Bernard Vore, pla.

Gerald S Frank, U.S. Attorney's Office, Tucson, AZ, for Justice, Department of, John Ashcroft, Attorney General, Prisons, Federal Bureau of, Kathleen Hawk Sawyer, Director, Berta Lockhart, Warden, dfts.

### ORDER

BURY, District Judge.

Pending before this Court is Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment, as well as Plaintiff's Cross–Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion to Dismiss, construed as a Motion for Summary Judgment, is granted and Plaintiff's Cross–Motion is denied.

## I. INTRODUCTION

Plaintiff is an inmate currently incarcerated at Federal Correctional Institution ("FCI"), Tucson, Arizona. Plaintiff is serving a sentence of 157 months imprisonment, followed by 3 years of supervised release for Bank Robbery in violation of 18 U.S.C. §§ 2113(a) and (2). Plaintiff was sentenced on July 3, 1997.

On December 19, 2000, Congress enacted the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), 42 U.S.C. §§ 14135(a)—14135(e). The DNA Act provides, in relevant part, that the Bureau of Prisons ("BOP") "shall collect a DNA sample from each individual in the custody of the Bureau of Prisons who is, or has

been, convicted of a qualifying Federal offense." 42 U.S.C. § 14135a(a)(1). Plaintiff's conviction for Bank Robbery under 18 U.S.C. § 2113 is a qualifying Federal offense under the DNA Act. 42 U.S.C. § 14135a(d)(1)(E). The Director of the BOP is authorized to use "such means as are reasonably necessary to detain, restrain, and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample." 42 U.S.C. § 14135a(a)(4)(A). The DNA Act also criminalizes the unauthorized retention or disclosure of a DNA sample, and expunges a person's DNA records if his qualifying convictions are overturned. *See* 42 U.S.C. §§ 14135e, 14132.

Plaintiff filed the present action for declaratory and injunctive relief on August 20, 2002, after learning that he was required to provide a blood sample in accordance with the DNA Act. On September 12, 2002, a blood sample was forcibly taken from Plaintiff for the purpose of collecting a DNA sample.

Plaintiff raises four arguments. First, Plaintiff argues the DNA Act unconstitutionally violates his rights under the Fourth Amendment. Second, Plaintiff argues the DNA Act unconstitutionally violates his right to due process under the Fifth Amendment. Third, Plaintiff argues the DNA Act unconstitutionally violates his right to remain silent and his protection against self-incrimination under the Fifth Amendment. Finally, Plaintiff argues that the DNA Act violates the Ex Post Facto Clause of the Constitution, Article 1, § 9, cl. 3, as it was enacted after the imposition of Plaintiff's conviction and sentence.

All of Plaintiff's arguments lack merit.

## II. DISCUSSION

### A. Standard of Review

Defendants' Motion is characterized as a Motion to Dismiss pursuant to Rule

12(b)(6), Fed.R.Civ.P., or, alternatively, a Motion for Summary Judgment pursuant to Rule 56(c), Fed.R.Civ.P. Defendants attached exhibits to their Motion, thereby presenting matters outside of the pleadings. Plaintiff included exhibits with his Cross–Motion, as well. Accordingly, this Court treats Defendants' Motion as a motion for summary judgment. Rule 12(b), Fed.R.Civ.P.

A motion for summary judgment shall be granted if there are no genuine issues of material fact, entitling the moving party to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A motion for summary judgment should be granted if reasonable minds could not differ that the moving party must prevail as a matter of law. *Id.* at 250–51, 106 S.Ct. at 2511–12. A mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *Id.* at 251, 106 S.Ct. at 2512. The party opposing a motion for summary judgment may not rest upon his pleadings, but must set forth specific facts which indicate that there is a genuine issue for trial. *Id.* at 250, 106 S.Ct. at 2511; Rule 56(e), Fed. R.Civ.P. The party with the burden of proof at trial also bears that same burden when making or opposing a motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Motions for summary judgment should be viewed "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2548. (Citations omitted.) Accordingly, the rules governing motions for summary judgment should be enforced with regard not just for rights of the nonmovant, but also for the rights of the party contending that there exists no genuine issue of material fact. *Id.*

## B. The DNA Act Does Not Violate the Fourth Amendment

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures and to be secure in one's person, house, papers, and effects. U.S. Const. Amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the government or those acting at their direction." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 613, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

Under the Fourth Amendment, all searches and seizures must be reasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 45, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Whether or not a search or seizure is reasonable is a fact-specific determination. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The "permissibility of a particular search is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402 (citation omitted). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 36, 121 S.Ct. 447. There are only limited circumstances in which individualized suspicion is not required. *Id.* Certain suspicionless searches are constitutional where the purpose of the policy or program was designed to serve "special needs, beyond the normal need for law enforcement." *Id.* (citations omitted).

■ The special needs doctrine is limited in its application to exceptional circumstances and "must be analyzed in the context of the specific factual circumstances involved in the case." *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056–57 (9th Cir.2002) (citation omitted). If the primary purpose of the law or policy at issue is ordinary law enforcement, the special needs doctrine is inapplicable and the search violates the Fourth Amendment, absent individualized suspicion. *Edmond*, 531 U.S. at 46–48, 121 S.Ct. 447; *Ferguson v. City of Charleston*, 532 U.S. 67, 81, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) ("In looking to the programmatic purpose, we consider all the available evidence in order to determine the relevant primary purpose."). It is not enough that the ultimate purpose is something other than ordinary law enforcement if the primary purpose is not. *Ferguson*, 532 U.S. at 81, 121 S.Ct. 1281.

■ If the court determines that the primary purpose of the law or policy is beyond the normal need for law enforcement, it must perform "a careful balancing of governmental and private interests." *Portillo v. United States District Court for the District of Arizona*, 15 F.3d 819, 823 (9th Cir.1994) (per curiam) (*quoting Skinner*, 489 U.S. at 624, 109 S.Ct. 1402). "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624, 109 S.Ct. 1402. In other words, the special needs doctrine reaffirms "the long-standing principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (citation omitted).

■ It is well-established that a compelled intrusion into the body for blood to be analyzed is a Fourth Amendment search. *Skinner*, 489 U.S. at 616, 109 S.Ct. 1402. Undoubtedly, the DNA Act implicates the Fourth Amendment by requiring the non-consensual extraction of DNA from a person. *See Rise v. State of Oregon*, 59 F.3d 1556, 1558–59 (9th Cir. 1995). Accordingly, the issue is whether the DNA Act is a valid suspicionless search pursuant to the special needs doctrine.

■ While they do not forfeit all constitutional protections by reason of their conviction and imprisonment, prisoners do have limited privacy rights under the Fourth Amendment. *See Hudson v. Palmer*, 468 U.S. 517, 526–528, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Indeed, the Ninth Circuit has noted that the Supreme Court in *Hudson* "may have intended to strip the inmates of all Fourth Amendment privacy rights." *Somers v. Thurman*, 109 F.3d 614, 617 (9th Cir.1997). As the Supreme Court noted, in dicta, in *Hudson*:

A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement." *Bell v. Wolfish*, 441 U.S. [520] at 537, 99 S.Ct. [1861] at 1873, 60 L.Ed.2d 447 [ (1979) ].

*Hudson*, 468 U.S. at 527–28, 104 S.Ct. 3194 (footnote omitted). According to the

Ninth Circuit, "it is unclear from the dicta in *Hudson* whether prisoners retain any rights cognizable under the Fourth Amendment against searches qua searches of their bodies, or whether the only safeguard against assertedly egregious searches in prison is the Eighth Amendment." *Somers,* 109 F.3d at 618. Regardless, whatever rights prisoners do retain under the Fourth Amendment, they are certainly restricted. *See Thompson v. Souza,* 111 F.3d 694, 699 (9th Cir.1997).

■ As best as this Court can tell, all but one of the courts to address the constitutionality of the DNA Act have upheld it as constitutional under the Fourth Amendment. *See United States v. Kimler,* 335 F.3d 1132 (10th Cir.2003); *Miller v. United States Parole Commission,* 259 F.Supp.2d 1166 (D.Kan.2003); *United States v. Sczubelek,* 255 F.Supp.2d 315 (D.Del.2003); *United States v. Reynard,* 220 F.Supp.2d 1142 (S.D.Cal.2002); *Groceman v. United States Department of Justice,* 2002 WL 1398559 (N.D.Tex.2002); *but see United States v. Miles,* 228 F.Supp.2d 1130 (E.D.Cal.2002). Additionally, the vast majority of courts to consider similar state statutes have found such statutes to also satisfy the Fourth Amendment. *See e.g. Jones v. Murray,* 962 F.2d 302 (4th Cir.1992) (upholding Virginia DNA collection statute); *Rise v. State of Oregon,* 59 F.3d 1556 (9th Cir.1995) (upholding Oregon DNA collection statute) [1]; *Boling v. Romer,* 101 F.3d 1336 (10th Cir.) (upholding Colorado DNA collection statute);

*Schlicher v.(NFN) Peters I & I,* 103 F.3d 940 (10th Cir.1996) (upholding Kansas DNA collection statute); *Roe v. Marcotte,* 193 F.3d 72 (2d Cir.1999) (upholding Connecticut DNA collection statute); *Velasquez v. Woods,* 329 F.3d 420 (5th Cir.2003) (per curiam) (upholding Texas DNA collection statute); *Nicholas v. Goord,* 2003 WL 256774 (S.D.N.Y.2003) (upholding New York DNA collection statute). The consensus reached in those decisions is that DNA collection statutes in general, and the DNA Act in particular, are constitutional under the special needs doctrine. This Court agrees.

At the time the DNA Act was enacted, all 50 states had statutes that required convicted felons to provide DNA samples for analysis and entry into the Combined DNA Index System ("CODIS") established by the FBI pursuant to the Violent Crime Control and Law Enforcement Act of 1994. H.R. Rep. 106–900(I), 106th Cong., 2nd Sess.2000, at *8. The Violent Crime Control and Law Enforcement Act, however, did not provide for the taking of DNA samples from persons convicted of Federal offenses, crimes under the laws of the District of Columbia, or crimes under the Uniform Code of Military Justice. *Id.* at *8–9. The DNA Act was passed because Congress recognized "an urgent need to address the gap in coverage of the national DNA index that [had] left out federal offenders." *Reynard,* 220 F.Supp.2d at 1146 n. 2 (*citing* 146 Cong. Rec. S11654–02, at *S11647, 2000 WL 1784925 (Dec. 6, 2000)).

---

**1.** This Court acknowledges the flaw in the *Rise* court's "special needs" analysis when in concluded that the Oregon statute was constitutional "even if its only objective is law enforcement." *Rise,* 59 F.3d at 1559. This conclusion directly conflicts with the Supreme Court's post-*Rise* decisions in *Edmond* and *Ferguson,* which limit the application of the special needs doctrine to searches whose primary purpose is *not* ordinary law enforcement. *See Reynard,* 220 F.Supp.2d at 1166 n.

29. Inasmuch as the Supreme Court has "undercut the theory or reasoning underlying" the *Rise* decision, this Court is not obliged to follow it as controlling, at least with respect to its "special needs" analysis. *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir.2003) (*en banc*). At the end of the day, however, the propriety of *Rise* is of no moment as the overwhelming persuasive authority more than adequately supports this Court's decision.

Based upon the above legislative history, this Court concludes that the primary and immediate purpose of the DNA Act "is programmatic, designed to fill the CODIS system with samples from qualifying federal offenders to parallel all fifty states' requirements." *Sczubelek*, 255 F.Supp.2d at 323; *see also Kimler*, 335 F.3d at 1146 ("The DNA Act, while implicating the Fourth Amendment, is a reasonable search and seizure under the special needs exception to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need"). It was the sense of Congress that a comprehensive DNA database can conclusively establish guilt or innocence, result in the post-conviction exoneration of innocent persons, including some sentenced to death, as well as deter recidivism. 146 Cong. Rec. S11645–02, at *S11645–S11646.

In *Miles*, the district court concluded that the above governmental interests were "indistinguishable from the government's basic interest in enforcing the law." *Miles*, 228 F.Supp.2d at 1139. The *Miles* court is alone in its conclusion.[2] Unlike the programs deemed unconstitutional by the Supreme Court in *Edmond* and *Ferguson*, the DNA Act is not designed to dis-

cover and produce evidence of a specific individual's criminal wrongdoing. *See Sczubelek*, 255 F.Supp.2d at 322. In *Edmond*, the Supreme Court struck down a vehicle drug checkpoint program as it was designed to discover and seize illegal narcotics, an ordinary law enforcement purpose, *Edmond*, 531 U.S. at 42–44, 121 S.Ct. 447. The Supreme Court concluded that "[t]he primary purpose of the Indianapolis narcotics checkpoints is in the end to advance the general interest in crime control." *Id.* at 44, 121 S.Ct. 447.

Likewise, in *Ferguson*, the Supreme Court struck down a hospital policy that required drug testing of all maternity patients suspected of drug use. *Ferguson*, 532 U.S. at 70–73, 121 S.Ct. 1281. The policy was developed jointly by prosecutors, police, and hospital staff and the patients never knew of the policy nor consented to the tests. *Id.* at 72–73, 121 S.Ct. 1281. According to the Court, "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." *Id.* at 84, 121 S.Ct. 1281.

---

**2.** The *Miles* decision has been roundly criticized by several courts. For instance, in *Kimler*, the Tenth Circuit criticized the *Miles* court's characterization of the DNA Act's application to convicted felons and not free citizens as a distinction without a difference. *Miles*, 228 F.Supp.2d at 1137–38. The Tenth Circuit disagreed with this characterization, explaining that the Supreme Court recently noted that "[a] broad range of choices that might infringe constitutional rights in free society fall within the expected conditions … of those who have suffered a lawful conviction." *Kimler*, 335 F.3d at 1146 n. 14 (*quoting McKune v. Lile*, 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002)).

In *Miller*, the court was equally critical of the *Miles* court's "distinction without a difference" characterization.

This Court finds this to be a distinction *with* a difference. Plaintiff is under the supervision of the Parole Commission and is still serving, albeit on parole, the remainder of a 20 year sentence. He is not a free citizen and in a considerably different position than the pregnant women or random motorists affected by the statutes at issue in *Ferguson* and *Edmond* …. Plaintiff's privacy interests are diminished, and as a felon on parole …, he is not entitled to the same consideration as a free citizen without such criminal history and status.

*Miller*, 259 F.Supp.2d at 1176–77 (emphasis original); *see also Sczubelek*, 255 F.Supp.2d at 322–23; *Nicholas*, 2003 WL 256774, at *15.

The unconstitutional programs in *Edmond* and *Ferguson* had as their primary purpose the discovery of evidence against particular individuals suspected of committing a specific crime. On the other hand, by requiring the collection of DNA samples from those convicted of qualifying federal offenses, the DNA Act's primary purpose is to fill the CODIS database. A DNA sample is only evidence of an individual's genetic code and does not, on its own, evidence the commission of a crime. *Sczubelek*, 255 F.Supp.2d at 322. "Unlike a urinalysis which can reflect the presence of illegal substances, the DNA sample only offers the potential to link the donor with a crime." *Id.* (citation omitted). Indeed, the CODIS database does not store any information regarding individuals' criminal history or social security numbers. Note, *Arresting Crime: Expanding the Scope of the DNA Database in America*, 79 Tex. L.Rev. 921, 927 (2001) (*citing* Press Release, U.S. Department of Justice, Federal Bureau of Investigation, The National DNA Index System (Oct. 13, 1998), *available at* http://www.fbi.gov/pressrm/pressrel/pressrel98/dna.htm). Rather than purporting to investigate particular or specific crimes, the DNA Act "creates a database for solving crimes that have not yet occurred or crimes that have occurred but are not specifically being looked at when taking any one individual's blood sample." *Miller*, 259 F.Supp.2d at 1176.

Granted, ultimately an individual's DNA sample may be used for law enforcement purposes. However, "[p]urported special needs searches that may ultimately be used for law enforcement purposes are more likely to pass Fourth Amendment muster if the searches are conducted in a uniform, non-discretionary manner." *Reynard*, 220 F.Supp.2d at 1165 (internal quotation marks omitted) (*citing Von Raab*, 489 U.S. at 667, 672 n. 2, 109 S.Ct. 1384); *see also Marcotte*, 193 F.3d at 79 ("Although the samples may later be used for law enforcement purposes, traditional concerns of probable cause and reasonable suspicion are minimized by the [DNA Act's] blanket approach to testing."). Under the DNA Act there is no discretion involved; all persons convicted of qualifying federal offenses must provide DNA samples. 42 U.S.C. § 14135a(a)(1); *see Von Raab*, 489 U.S. at 667, 109 S.Ct. 1384 (Customs Service's testing of all employees who applied for particular positions was reasonable because no official discretion was involved and all such employees were tested on a blanket basis.).

Beyond the DNA Act's immediate purpose of filling the CODIS database, there are at least three other purposes suggested by the DNA Act's legislative history. *Reynard*, 220 F.Supp.2d at 1168.

First, Congress desired to assist state and federal law enforcement agencies with their basic law enforcement functions by "match[ing] DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders." 146 Cong. Rec. H8572–01, at *H8575. Second, Congress desired to increase the accuracy of the criminal justice system by "eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for crimes that they did not commit." *Id.* at *H8576. *See also id* at *H8578 ("It is crucial for defendants to have access to the CODIS system in circumstances that possibly establish innocence"); 146 Cong. Rec. S11645–02, at *S11646 (finding that DNA testing has exonerated over 75 convicted persons in the United States and Canada); H.R. Rep. 106–900(I), at *10 ("...DNA matching exonerates any other persons who might wrongfully be suspected, accused, or convicted of the crime"). Third, Congress desired to prevent violent felons from repeating their crimes in the future. 146 Cong. Rec. S11645–02, at *S11646 ("Statistics

show that many of these violent felons will repeat their crimes once they are back in society").

*Id.*

Hence, searches under the DNA Act serve at least two purposes beyond the normal need for law enforcement. *Id.* "First, the searches contribute to the creation of a more accurate criminal justice system." *Id.* Increased accuracy is of critical importance in light of the fact that "post-conviction DNA testing and other post-conviction investigative techniques have shown that innocent people have been sentenced to death in the United States." 146 Cong. Rec. S11645-02, at *S11645. "Second, the searches allow for a more complete DNA database, which will assist law enforcement agencies to solve future crimes that have not yet been committed." *Reynard,* 220 F.Supp.2d at 1168. Thus, since samples taken under the DNA Act are done so in a uniform, non-discretionary manner, and the primary purpose of the DNA Act is beyond the basic interest in crime control, they are proper special needs searches. *See Kimler,* 335 F.3d at 1146-47; *Reynard,* 220 F.Supp.2d at 1167-1169.

Having concluded that searches under the DNA Act are within the special needs doctrine, this Court must now weigh the intrusion on Plaintiff's interest in privacy against the special needs that support the DNA Act. *See Ferguson,* 532 U.S. at 78, 121 S.Ct. 1281. It is well-established that blood tests are not "an unduly extensive imposition on an individual's privacy and bodily integrity." *Skinner,* 489 U.S. at 625, 109 S.Ct. 1402 (*quoting Winston v. Lee,* 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)); *see also Breithaupt v. Abram,* 352 U.S. 432, 436, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) ("The blood test procedure has become routine in our everyday life"). Thus, the intrusion by the DNA Act upon Plaintiff's privacy interest has

been "characterized as minimal" by the Supreme Court. *Marcotte,* 193 F.3d at 79. The intrusion is further minimized by Plaintiff's reduced expectation of privacy as a prisoner. *See, e.g., Hudson,* 468 U.S. at 525-28, 104 S.Ct. 3194; *see also Portillo,* 15 F.3d at 823-24.

Balanced against this minimal intrusion upon Plaintiff's privacy interest is the government's significant interest in filling the CODIS database, increasing the accuracy of the criminal justice system, and providing a means to assist law enforcement in solving future crimes. *See Marcotte,* 193 F.3d at 79-80; *Reynard,* 220 F.Supp.2d at 1168-69; *Miller,* 259 F.Supp.2d at 1177 ("The intrusion of a DNA test is minimal. As discussed above, Plaintiff's privacy interest in his identity is severely diminished both by his status as a convicted felon as well as his status as a parolee"); *Sczubelek,* 255 F.Supp.2d at 323 ("Weighing the special need for DNA testing against defendant's diminished expectation of privacy and the minor intrusiveness of a blood test, the court finds the DNA Act testing requirements reasonable").

Based upon the foregoing, this Court concludes that the mandatory collection of DNA from Plaintiff, a person convicted of a qualifying Federal offense, pursuant to the DNA Act, falls within the "special needs" exception of the Fourth Amendment.

## C. The DNA Act Does Not Violate the Fifth Amendment Privilege Against Self–Incrimination

■ Plaintiff's claim that the DNA Act violates his right against self-incrimination is meritless. In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court held that while blood test evidence is potentially incriminating, it is neither testimony nor evidence of any communicative act. *Id.* at 764-65,

86 S.Ct. 1826. Thus, the Supreme Court held that the involuntary seizure of a blood sample does not violate the privilege against self-incrimination. *Id.; see also Reynard*, 220 F.Supp.2d at 1174 (*citing Belgarde v. Montana*, 123 F.3d 1210, 1214 (9th Cir.1997) (holding that results from involuntary blood test are neither testimonial nor communicative evidence implicating the Fifth Amendment)).

### D. The DNA Act Does Not Violate the Due Process Clause of the Fifth Amendment

■ Plaintiff's claim that the DNA Act violates the Due Process Clause of the Fifth Amendment is equally meritless. Once again, in *Schmerber*, the Supreme Court held that the drawing of blood by a medical professional in an acceptable environment is not offensive to the ordinary sense of justice and, therefore, not violative of the Due Process Clause. *Schmerber*, 384 U.S. at 759–60, 86 S.Ct. 1826 (*citing Breithaupt v. Abram*, 352 U.S. 432, 436–37, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (the taking of blood by a trained physician does not "shock[ ] the conscience" or "offend[ ] a 'sense of justice'")); *see also Groceman*, 2002 WL 1398559, at *4; *Miller*, 259 F.Supp.2d at 1169–70. Moreover, in *Rise*, the Ninth Circuit held that "[t]he extraction of blood from an individual in a simple, medically acceptable manner, despite the individual's lack of an opportunity to object to the procedure, does not implicate the Due Process Clause." *Rise*, 59 F.3d at 1562–63.

### E. The DNA Act Does Not Violate the Ex Post Facto Clause

■ Plaintiff argues that since the DNA Act was not enacted until after his conviction for Bank Robbery, its application to him violates the prohibition against ex post facto laws. U.S. Const. Art. 1, § 9, cl. 3. However, as the Ninth Circuit explained in *Rise*, "[n]ot every change in a

convicted person's situation violates the Ex Post Facto Clause." *Rise*, 59 F.3d at 1562. The Ex Post Facto Clause is implicated only if a law "criminalizes conduct that was not a crime when it was committed, increases the punishment for a crime beyond what it was at the time the act was committed, or deprives a person of a defense available at the time the act was committed." *Id.* (*citing Collins v. Youngblood*, 497 U.S. 37, 42–43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)). In the Ninth Circuit, "legislation may lawfully impose new requirements on convicted persons if the statute's 'overall design and effect' indicates a 'non-punitive intent.'" *Id.* (*quoting United States v. Huss*, 7 F.3d 1444, 1447 (9th Cir.1993)).

The DNA Act does not amend substantive criminal laws. *See id.; see also Reynard*, 220 F.Supp.2d at 1160–62; *Miller*, 259 F.Supp.2d at 1170–73. Rather, as explained above, the principal purpose of the DNA Act is to build a DNA database. *See Kimler*, 335 F.3d at 1146. The DNA Act is not designed to punish those who have already been convicted. Granted, the DNA Act does criminalize an individual's refusal to provide a DNA sample. However, "such non-compliance is punished as a separate offense, which diminishes potential ex post facto problems." *Reynard*, 220 F.Supp.2d at 1162 (*citing Russell v. Gregoire*, 124 F.3d 1079, 1088–89 (9th Cir. 1997)). In short, the DNA Act does not violate the Ex Post Facto Clause.

### IV. CONCLUSION

Based upon the foregoing, the DNA Act, as applied to Plaintiff, violates neither the Fourth or Fifth Amendments, nor the Ex Post Facto Clause. No question of material fact exists regarding any of Plaintiff's claims.

**Accordingly,**

**IT IS ORDERED** that Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (document 18) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Cross–Motion for Summary Judgment (document 22) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment accordingly.

### JUDGMENT IN A CIVIL CASE

**DECISION BY COURT.** This action came under consideration before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiff's Cross–Motion for Summary Judgment is DENIED.

**IT IS FURTHER ORDERED** that this case is DISMISSED.